STATE v. SQUIRE MOORE, JR.

(Filed 12 December, 1956.)

**1. Criminal Law § 31c: Evidence § 51—**

The competency of a witness to testify as an expert in the particular matter at issue is addressed primarily to the discretion of the trial court, and its determination is ordinarily conclusive unless there be no evidence to support the finding or unless there is abuse of discretion.

**2. Same—**

Where a witness is tendered as an expert upon abundant evidence of qualification, the act of the trial court in permitting him to testify as an

expert is tantamount to holding him to be an expert in the field of his testimony.

**3. Criminal Law § 31h: Evidence § 47f: Automobiles § 71—**

Where there is ample evidence of a witness' qualification as an expert on the subject of chemical analysis of human blood to determine the alcoholic content thereof, and as to the effect of certain percentages of alcohol in the blood stream, the admission of his testimony as to the alcoholic content of defendant's blood as revealed by a test made by the witness shortly after defendant's arrest and as to the effect of certain percentages of alcohol in the blood stream, will not be held for error upon objection, the qualification of the witness being addressed to the discretion of the trial court and abuse of discretion not appearing.

**4. Criminal Law § 62f—**

Where appeal is taken to the entry of judgment suspending the prison term, the judgment will be stricken on appeal and the cause remanded for proper judgment.

JOHNSON, J., not sitting.

APPEAL by defendant from *Gwyn, J.,* at 16 April, 1956, Criminal Term of GUILFORD.

Criminal prosecution upon a bill of indictment charging that on 27 May, 1955, Squire Moore, Jr., at and in the County of Guilford, "unlawfully and willfully did drive a motor vehicle upon the public highways of North Carolina while under the influence of intoxicating liquor and narcotic drugs, against the form of the statute in such case made and provided," etc.,—it being stipulated that the prosecution originated in Municipal Court of the City of Greensboro upon a proper warrant charging defendant with the identical offense charged in the bill, and same was lawfully transferred to Superior Court for trial when defendant demanded trial by jury.

Plea: Not guilty.

Upon trial in Superior Court the State offered testimony of a member of the Greensboro police department tending to show that while on duty as a police officer, driving in a police car around 3:30 or 3:45 a.m., on 27 May, 1955, he saw a Buick automobile traveling on certain public streets in the city of Greensboro; that it was going from side to side; that he stopped the Buick automobile at the intersection of Wilkerson and Bennett Streets; that defendant was driving it, and was so intoxicated that the officer helped him out, and arrested him for driving intoxicated, and took him to the police station; that in the opinion of the officer the physical and mental faculties of defendant were impaired, and he was under the influence of some intoxicating beverage,—that he was drunk; and that on the way to the police station the officer told defendant he could get a blood test if he wanted it, and explained to

him the blood test would show up the alcoholic content in his blood; and defendant "agreed to take it, and he took it." The State then rested its case.

Defendant, reserving exception to the denial of his motion for judgment as of nonsuit, offered testimony tending to show that he had a general good character, and that he only had beer to drink, and was sober. And defendant, as witness, testified that he was driving his automobile; that he told the officer he had been drinking a couple of beers, and was not under the influence of any kind of intoxicating drink or liquor,—did not feel them; that the officer said, quoting defendant, "looked like I had drunk a case of beer"; and that the officer asked him (defendant) about taking a blood test, to which he said "O.K." and went on and took the test.

Defendant renewed motion for judgment as of nonsuit, and same was denied, and defendant excepted. The State then rested, and counsel for defendant made and completed his address to the jury on behalf of defendant, but counsel for State had not addressed the jury.

Counsel for State then moved the court to re-open the case and permit further evidence to be offered.

Thereupon further evidence for the State was offered. R. B. Davis, Jr., testified in pertinent part as follows: ". . . I am a chemist. I own and operate the Doctors' Medical Laboratory here in Greensboro. I perform all types of tests for the medical profession of Greensboro and Guilford County on patients in an attempt to help them arrive at a diagnosis. We run tests on blood, sputum, all types of body fluids and body secretions. We run tests for determination of the alcoholic content in the bloodstream. I have run over 1500 tests here in Greensboro. That covers a period which will be four years this coming October. As to my training in my profession, I graduated from Wake Forest College with a Batchelor of Science degree. I had nearly two years of medicine in Medical School and . . . a year and a half extra training at Burge Hospital in Springfield, Missouri. After that time I came back to Greensboro and opened the Doctors' Medical Laboratory. As to whether in any of these institutions I did any work in connection with alcohol tests, it was all types of tests I performed and learned the procedures, and so on. I did run tests analyzing blood. Most of the analyzing of blood was done at Burge Hospital . . . for component parts of blood in disease and conditions under those situations. The courses I had in medical school pertinent and relevant to the work I am now performing were: . . . gross anatomy, neurological anatomy, haemotology, physiology, bio-chemistry . . . I have run tests correlating my observation of an individual with my findings of the blood tests. I have done so in a hundred cases. I have made the mental observation, and so forth, to compare with my test. In the cases that I have studied

from a physical appearance . . . a man's action, his reflex actions, pupils of his eyes . . . to attempt to determine whether or not I could draw any kind of similarity between a man's physical appearance and that of my blood-alcohol test. In all cases where a person's appearance would indicate intoxication, my test bore it out." Then, over objection and exception by defendant, the witness, in response to question by the State, as to what recognized medical associations and professional group he is a member of pertinent to this line of work, stated: "I belong to the American Technologists Association; . . . to a group sponsored by the American Technologists Association in which we have membership known as Clinical Laboratory Directors; . . . to the North Carolina Public Health Association, the North Carolina Bacteriological Association, the American Council of Bio-Analysts, and . . . of the American Association for the advancement of Science . . . a 108-year-old organization."

Then over objection and exception by defendant, this question was asked the witness: "Q. Mr. Davis, based upon your education, training, and experience in the analyzing of blood, particularly with reference to the alcoholic content, state whether you are able to give an opinion as to whether or not a person is under the influence of some intoxicating beverage from the results of your laboratory tests and results of your finding in regard to the alcoholic content of that blood," to which the witness answered: "Yes, I am, sir."

Thereupon the State submitted Mr. Davis to the court "as an expert haemotologist and clinical technologist and technician and chemist."

Objection by defendant was overruled, and he excepted.

Then the witness proceeded to testify, without objection: That in response to call, in early morning of 27 May, 1955, he went to police station, arriving around 4 o'clock, and there as result of conversation with defendant, and for defendant, he took a sample of blood from defendant, and later made an analysis at his laboratory.

Then over objection and exception by defendant, the witness was asked these questions to which he answered as indicated: "Q. Now, then, Mr. Davis, what were the results of this blood-alcohol test that you ran on the defendant Squire Moore's blood? A. The result of this test showed that there was 0.22% concentration of alcohol in the bloodstream. Q. Mr. Davis would you explain to the jury exactly what 0.22% of alcohol means in relation to whether or not a person is intoxicated? A. 0.22% alcoholic concentration shows that the person is under the influence of alcohol. Q. At what point does a person become under the influence in regard to the percentage of alcohol in his bloodstream? A. At 0.15% or above. Q. Mr. Davis, in your opinion, at what point is a person not under the influence in regard to the percentage of alcohol in his bloodstream? A. In my opinion 0.01 to 0.04 a person is not under

the influence of alcohol. Q. Mr. Davis, in your opinion, at 0.05% state whether or not a person is under the influence? A. At 0.05% a person could or could not be. That is to say maybe one person out of a hundred would be under the influence at 0.05. Q. Mr. Davis, in your opinion, at what scale in regard to the percentage of alcohol in a person's bloodstream could a person be or not be under the influence? A. The scale would be 0.05, 0.06, and so on up to 0.14%, anywhere in that range. Q. So you say from 0.05 up to but not including 0.15 a person could or could not in your opinion be under the influence of some intoxicating liquor? A. That's right. Q. Mr. Davis, would you explain to the jury . . . the variance there? A. Well, progressing, 0.05 might have one person out of a hundred under the influence of alcohol at that concentration, at 0.06 we might have a few more showing being under the influence, and so we go on up the scale to 0.14 maybe you wouldn't have but one person out of the average hundred who was not showing being under the influence of alcohol. So, as the scale progresses upward, more and more people become under the influence. Q. And then at 0.15 everyone is considered to be under the influence? A. Yes, sir. (The Court, in his discretion, permitted the leading character of question.) Q. Mr. Davis, at what point does a person become unconscious in regard to the alcoholic content in his bloodstream? A. At 0.35% above. Q. At what point does death ensue, Mr. Davis, in regard to the alcoholic content of a person's blood? A. At a concentration of 0.45 to point 50. Q. Mr. Davis, state whether or not alcohol in the stomach causes a person to become intoxicated? A. It will not. Q. When does and where is its location in respect to causing a person to become intoxicated? A. The alcohol must be in the bloodstream. Q. Now, Mr. Davis, does the alcoholic content that you in your laboratory findings . . . indicate the amount of alcoholic beverages that a person has consumed? A. No, sir. Q. What does it? A. It simply represents the concentration of alcohol in the bloodstream, how much is concentrated in the bloodstream. Q. Mr. Davis, what factors determine the amount of alcohol that will show up in the bloodstream in relation to an individual? A. Well, whether there is any food in the stomach, particularly proteins and fats will slow down the absorption rate of alcohol. Another thing that is depended on is the condition of an individual's liver, inasmuch as the liver is the chief organ in the body of getting rid of alcohol. Whether or not the individual is . . . alcoholic or whether or not he is a person who might be called a temperate or moderate drinker. Those are the factors which enter into that question, I believe. Q. Mr. Davis, from your education, training and experience do you have an opinion satisfactory to yourself as to whether or not the defendant Squire Moore was under the influence of some intoxicating beverage when you took the blood sample from him there on the 27th day of

May, 1955, at the police station?  A. Yes, sir.  Q. What is your opinion? A. He was, sir."

Then defendant, through his counsel, cross-examined the witness Davis as to subjects he studied at Wake Forest College and at Oglethorpe University; and as to tests made by him at Burge Hospital; and as to the establishment by him of the laboratory at Greensboro; and as to how he made tests for ascertainment of alcoholic content of blood; and as to instructions in connection therewith; and as to whether he had any personal memory of defendant to indicate that he was intoxicated. In the course of the examination, the court inquired of counsel if he were undertaking to show instructions as to operation of apparatus the witness had were wrong.  Counsel replied that he was "undertaking to find out really how this man gets to be a blood tester for alcohol."  The cross-examination was concluded with the question: "Q. He didn't do anything then, so far as you know, to make it obvious to you he had drunk anything?  A. I don't have any reason to remember anything of that kind."

Thereupon the State rested.  Defendant renewed motion for judgment as of nonsuit.  Overruled.  And counsel for defendant was permitted to re-argue the case to the jury.

The case was then submitted to the jury under charge of the court.

Verdict: Guilty as charged.

Judgment: Confinement in common jail of Guilford County for the term of six months, to be assigned to work under the supervision of State Highway and Public Works Commission and pay a fine of $100.00 and costs.  Prison sentence suspended for a period of three years on conditions stated.

Defendant excepted thereto and appeals therefrom to Supreme Court and assigns error.

*Attorney-General Patton and Assistant Attorney-General Robert E. Giles for the State.*

*Robert S. Cahoon for Defendant Appellant.*

WINBORNE, C. J.   While this appeal contains numerous assignments of error, founded upon exceptions to evidence offered, and to the charge, the basic question presented is this:  Did the trial court err in finding the witness Davis (1) qualified as an expert to testify on the subject of chemical analysis of human blood to determine alcoholic content thereof, and (2) qualified as an expert to testify as to the effects of certain percentages of alcohol in the bloodstream?

If the witness were qualified, his testimony was competent, and if he were not, it would be incompetent.

In this connection this Court has uniformly held that the competency of a witness to testify as an expert is a question primarily addressed to the court, and his discretion is ordinarily conclusive, that is, unless there be no evidence to support the finding, or unless the judge abuse his discretion. *LaVecchia v. Land Bank,* 218 N.C. 35, 9 S.E. 2d 489, and cases cited. See also *S. v. Smith,* 221 N.C. 278, 20 S.E. 2d 313; *In re Humphrey,* 236 N.C. 142, 71 S.E. 2d 915; *Samet v. Ins. Co.,* 237 N.C. 758, 75 S.E. 2d 913. Anno. 166 A.L.R. 1067.

In the *Smith case, supra, Seawell, J.,* writing for the Court, declared: "The qualification of a witness to give an opinion as one skilled, or as is usually termed, an expert, depends on matters of fact and the question is addressed to the trial judge, with opportunity to the objector to test the experience of the witness by appropriate examination. Regardless of the professional label, it is for the court to say whether the witness is qualified to testify as one skilled in the matter at issue, and his finding will not be disturbed when there is evidence to support it, and the discretion has not been abused."

Here the witness testified in detail as to his study, training and experience. He was then tendered by the State as an expert haemotologist and clinical technologist and technician and chemist. Objection by defendant was overruled, and the witness was permitted to testify in the capacity of an expert. This was tantamount to the judge holding him to be an expert in the field of his testimony. The testimony indicates the knowledge and experience of the witness in conducting experiments as to alcoholic content in the blood of a human being, and as to the effect of alcohol upon the human system in respect to intoxication, when introduced into the blood stream. Thus it appears that there is abundant evidence to support the holding of the judge that the witness Davis is such expert.

Indeed in *S. v. Willard,* 241 N.C. 259, 84 S.E. 2d 899, this Court considered the question as to whether expert testimony as to the results of a blood test taken after a defendant's arrest on charge of driving under the influence of an intoxicating beverage is admissible in the courts of this State. In that case the witness was R. B. Davis, Jr., the same person as here. The trial court there held him to be an expert chemist and haemotologist, and defendant made no objection. And this Court held there that the expert testimony (given by the witness Davis) as to the results of tests of defendant's blood was admissible on the trial of the case on the charge of driving a motor vehicle upon the public highways within the State while under the influence of intoxicating beverage. G.S. 20-138.

Now on the present record it appears that this same witness has run tests correlating his observation of individuals, in a hundred cases, with his findings of the blood tests, and that in all cases where the person's

appearance would indicate intoxication, his test bore it out. And he testified that based upon his education, training and experience in the analyzing of blood, particularly with reference to the alcoholic content, he is able to give an opinion as to whether or not a person is under the influence of some intoxicating beverage from the results of his laboratory tests and results of his finding in regard to the alcoholic content of that blood.

Hence it does not appear that the trial judge abused his discretion in holding the witness Davis an expert. Therefore his testimony to which defendant excepts is competent evidence for the consideration of the jury.

Moreover the assignments of error, based upon exceptions to the portions of the charge, apparently are predicated upon contention that because evidence was erroneously admitted, the charge is in error. No error, however, is made to appear.

All assignments of error have been duly considered, and in the trial from which appeal is taken, there is no error.

However, appeal having been taken to entry of judgment, suspending prison term, the judgment is stricken and the cause remanded for proper judgment. See *S. v. Ritchie,* 243 N.C. 182, 90 S.E. 2d 301, and cases cited. Also *S. v. Ingram,* 243 N.C. 190, 90 S.E. 2d 304.

Error and remanded.

JOHNSON, J., not sitting.