EARLINE H. CLARKE v. CHARLES E. KERCHNER AND WIFE, MARGARET B. KERCHNER AND IRENE TAYLOR

No. 7118SC362

(Filed 23 June 1971)

1. Evidence § 48— competency of witness to testify as expert

The competency of a witness to testify as an expert is addressed to the discretion of the trial court, and its determination is ordinarily conclusive on appeal unless an abuse of discretion is shown or unless there be no evidence to support the finding.

2. Evidence § 48— qualification of expert witness — discretion of court

Trial court acted within its discretion in refusing to qualify the assistant director of a municipal public works as an expert witness to testify whether a landlord was negligent in the construction and maintenance of a back porch railing.

Clarke v. Kerchner

3. **Evidence § 40— nonexpert witness — answer to hypothetical questions**

A nonexpert witness' answers to hypothetical questions were properly excluded.

4. **Negligence § 47; Landlord and Tenant § 8— duty to visitor on premises — status of visitor**

The duty owed a person on the premises of another depends upon the status enjoyed by the visitor.

5. **Negligence § 59— licensee — social guest**

An invited social guest is a licensee.

6. **Landlord and Tenant § 8— duties of lessor — repair of premises**

A lessor is not under an implied covenant to repair the premises, and in the absence of agreement to the contrary, is not under a duty to keep the premises under repair, or to repair defects existing at the time the lease is executed.

7. **Landlord and Tenant § 8— liability of lessor — injury to lessee's social guest — condition of porch railing**

A lessee's social guest who was injured when the back porch railing of the demised premises gave way failed to offer sufficient evidence that the lessors of the premises, who were not in possession thereof, breached their common law duty to the guest, there being no evidence that the lessors wilfully injured the plaintiff or wantonly or recklessly exposed her to danger.

8. **Landlord and Tenant § 8— violation of municipal housing code**

A landlord's violation of the Greensboro housing code was not negligence *per se*.

APPEAL by plaintiff from *Thornburg, Special Judge,* 7 December 1970 Session of Superior Court held in GUILFORD County.

Plaintiff brought this action seeking damages for personal injuries allegedly received as a result of a fall from a back porch caused by the negligence of defendants. Defendants Charles E. and Margaret B. Kerchner own a house located at 1110 Stephens Street in Greensboro which was rented to defendant Irene Taylor at the time of the accident. Plaintiff alleged that defendants Kerchner were negligent in the construction of the porch railing which pulled loose when plaintiff "backed up lightly" against it. Plaintiff further alleged that defendants Kerchner were negligent in failing to disclose the defect prior to renting the house to defendant Taylor, and in painting and repairing the premises so as to conceal a dangerous condition. Plaintiff also alleged that the Kerchners were negligent in their failure to maintain the house in compliance with several provisions of the Housing Code of the City of Greensboro, a

municipal ordinance. Plaintiff alleged negligence by the defendant Taylor in failing to make the premises on which she lived and to which she invited plaintiff safe for ordinary use, in maintaining a concealed and dangerous condition of which she knew or should have known, and in failing to warn plaintiff of the condition. Plaintiff further alleged that defendant Taylor was negligent in her failure to maintain her house in compliance with provisions of the Greensboro Housing Code. Defendant Taylor and defendants Kerchner answered, denying negligence, and alleging that plaintiff was contributorily negligent in creating a dangerous situation and "forcefully" backing into the porch rail.

At the close of plaintiff's evidence, all the defendants moved for a directed verdict. The motion was allowed on the grounds that the plaintiff had failed to offer evidence of negligence by the defendants which was a proximate cause of plaintiff's injuries.

The evidence, taken in the light most favorable to the plaintiff, tends to show the following. Prior to 31 August 1968, defendant Taylor invited plaintiff to her home for a cookout. Plaintiff arrived around 5 o'clock in the afternoon of 31 August 1968, and entered the house by the front door. After stopping briefly inside the house, plaintiff followed defendant Taylor out the back door onto the back porch. On the back porch, plaintiff paused to talk with defendant Taylor's niece and to wait for some children in the back yard to line up so that plaintiff could photograph them. Defendant Taylor continued walking down the porch steps and into the back yard.

The back screen door out of which plaintiff walked was hinged on plaintiff's left as she faced the back yard. The back porch onto which she walked was approximately four feet long and approximately five feet wide. The roof of the porch is supported by 4 x 4 columns on each end. Each of these columns had 2 x 4 railings stretching horizontally between it and the house. The 2 x 4 railings were attached to the columns on one end, and to an upright wooden member attached to the house at the other end. The 2 x 4 railing which came loose when plaintiff fell was approximately three feet above the floor of the porch, and the floor of the porch is approximately 35 inches from the ground.

---

Clarke v. Kerchner

---

As the plaintiff stood talking with defendant Taylor's niece, some of the children who were in the back yard came up on the porch steps to go into the house, and as they did, plaintiff stepped to the side of the porch on which the door was hinged to make room for the children to go into the house through the back screen door. The lady with whom plaintiff was talking also moved to the side of the porch between the opened door and the horizontal rail. Plaintiff was closer to the house than the lady with whom she was talking, but both of them were on the same side of the porch. Plaintiff testified that she "barely touched the railing," and that before she knew anything, she "had done a flip." She said she stepped back behind the door that was being opened, and the lady with whom she was talking also stepped back to get out of the way of the opening door and the children entering the doorway. Plaintiff testified that the end of the railing next to the house gave way first, and then the entire top horizontal railing fell to the ground. Finally, plaintiff said, "After the fall that day the rail fell after I had finished falling after I fell. The entire top railing fell on the ground after I fell."

At the time of her injury, plaintiff was approximately 49 years old and weighed approximately 130 pounds. Plaintiff's doctor testified that as a result of plaintiff's fall, she suffered a separation of the right acromioclavicular joint and fracture of the caronoid process of the scapula with considerable displacement. Plaintiff now has 25 per cent permanent disability of the right shoulder joint and disfigurement.

Plaintiff's injury occurred on Saturday evening. On the following Sunday morning the railing was nailed back in place by the brother of the defendant Taylor who reinforced it with a metal brace at each end. Defendant Taylor's brother, called as plaintiff's witness, testified that he did not recall anything about the number of nails or the size of the nails in the railing prior to his repair. He did say, "You could see that the nails had pulled out." The witness further testified that the railing "had not been eaten up by termites or rotten or anything of that nature."

The real estate rental agent who was in charge of renting the house at the time of the accident, and for some nine years prior to that time was called as a witness for the plaintiff and

testified that he went down to Stephens Street "quite often," but could not state any particular times when he went. He testified that he had never seen any condition of the rails on the back porch that needed work, and that defendant Taylor had never reported to him that any rails were loose on the porch. The agent said the house was painted outside "a short time before, maybe a year or two before," and that he received no reports from the painter of anything wrong with the railing. He described the condition of the house in April of 1968 as "excellent."

Defendant Charles E. Kerchner was called as an adverse witness for the plaintiff. He testified that the house was eight years and nine months old at the time of the accident, and that a contractor built it according to floor plans drawn by him. Defendant Taylor was the third tenant to live in the house; her tenancy began 22 November 1962. First grade lumber was used in building the house. He did not handle the rental directly, but rented it through an agent. He went by the house occasionally, but had no regular schedule of inspection. He sometimes walked around the house, but did not enter it to inspect it. He had received no complaints of a loose railing; such complaints would ordinarily be directed to the rental agency. No repairs were made to the wooden structure of the house prior to the accident. Kerchner said, "In my experience, that sort of thing in a house that is well built just doesn't require any repairs in ten years or less, wooden repairs." The only testimony as to the size and number of nails in the railing came from Kerchner. He said, "I know that there are at least two nails placed in the two by fours in the ends. There may be more, I don't know. The types of nails used were steel nails, cut nails. I'm not sure I could tell you what size. I'm sure they were more than eight penny. I'm sure of that. I couldn't say the exact size of nails."

Defendant Irene Taylor was also called, and testified as an adverse witness for the plaintiff, in substance as follows: She does not go out on her back porch very much; she sometimes put towels on the porch railings to dry before putting them in the clothes hamper. She had never noticed the porch railings being loose prior to the time of the accident. She is not at home in the day time, and therefore does not know when the rental agent came to the premises to inspect them, but the agent has

come when she has called him. On the occasion in question, she was holding a cookout in her back yard, to which the plaintiff was invited.

John Fox, Assistant Director of Public Works for the City of Greensboro, testified that the custom and practice of builders in the community in nailing rails or banisters to posts and other supports was to put three or four nails into the end of the banister to secure it to the support to which it is attached. Plaintiff asked Mr. Fox numerous questions to which objections were made and sustained. Plaintiff also submitted Mr. Fox as an expert witness; the court refused to allow Mr. Fox to testify as an expert.

From the granting of defendants' motion for a directed verdict, plaintiff appealed.

*Clark and Tanner by David M. Clark for plaintiff appellant.*

*Perry C. Henson and Daniel W. Donahue for defendant appellees Kerchner.*

VAUGHN, Judge.

Appellant contends that the court erred in granting defendants' motion for a directed verdict. Before we can decide whether the evidence, taken in the light most favorable to the plaintiff was sufficient to be considered by the jury as to whether defendants breached a duty owed to plaintiff, we must decide (1) whether certain expert testimony should have been considered by the court below, and (2) what duty defendants owed plaintiff.

[1-3] Appellant assigns as error the failure of the court below to recognize her witness, John Fox, as an expert, and the failure to allow the witness to state his opinion in answer to hypothetical questions. The competency of a witness to testify as an expert is addressed to the discretion of the trial court, and its determination is ordinarily conclusive on appeal unless an abuse of discretion is shown or unless there be no evidence to support the finding. *State v. Moore,* 245 N.C. 158, 95 S.E. 2d 548; *In re Humphrey,* 236 N.C. 142, 71 S.E. 2d 915. No abuse of discretion affirmatively appears in the record nor is there a showing of a lack of evidence to support the finding. Because the witness

was not qualified as an expert, his answers to hypothetical questions were properly excluded.

[4-6] According to the well-established common law rules in effect in North Carolina, the duty owed a person on the premises of another depends on the status enjoyed by the visitor; different duties are owed to the invitee, the licensee, and the trespasser. *Hood v. Coach Co.*, 249 N.C. 534, 107 S.E. 2d 154. At the time of her injury, plaintiff was a social guest of the defendant Taylor. An' invited social guest is a licensee. *Cobb v. Clark*, 265 N.C. 194, 143 S.E. 2d 103; *Murrell v. Handley*, 245 N.C. 559, 96 S.E. 2d 717; *Haddock v. Lassiter*, 8 N.C. App. 243, 174 S.E. 2d 50. The duty an owner owes a licensee is described in detail in *Dunn v. Bomberger*, 213 N.C. 172, 195 S.E. 364:

> "As plaintiff's intestate was a licensee, defendant did not owe him the duty to keep his premises in a reasonably safe condition. The only duty resting upon the defendant was to refrain from willful or wanton negligence and from the commission of any act which would increase the hazard. The owner of land is not required to keep his premises in a suitable or safe condition for those who come there solely as licensees and who are not either expressly invited to enter or induced to come upon them for the purpose for which the premises are appropriated and occupied. In authoritative decisions of this and other jurisdictions the degree of care to be exercised by the owner of premises toward a person coming upon the premises as a bare or permissive licensee for his own convenience is to refrain from willful or wanton negligence and from doing any act which increases the hazard to the licensee while he is upon the premises. The owner is not liable for injuries resulting to a licensee from defects, obstacles or pitfalls upon the premises unless the owner is affirmatively and actively negligent in respect to such defect, obstacle or pitfall while the licensee is upon his premises, resulting in increased hazard and danger to the licensee. *Brigman v. Construction Co.*, 192 N.C., 791, and cases there cited. The *Brigman* case is reported and annotated in 49 A.L.R., 773."

Such is the common law duty of the owner of premises, when the owner is in possession. To understand the common law duty of a lessor, one must keep in mind the rule that a lessor is not

under an implied covenant to repair the premises, and in the absence of agreement to the contrary, is not under a duty to keep the premises under repair, or to repair defects existing at the time the lease is executed. *Thompson v. Shoemaker,* 7 N.C. App. 687, 173 S.E. 2d 627. Thus, the liability of the lessor is summarized as follows:

> "The lessor is not ordinarily liable to a tenant, or the tenant's sublessee, family, servants, or guests, for personal injuries resulting from disrepair, or patent defects, even when the lessor is under a contractual obligation in his lease to keep the premises in repair, or even if the danger- ous condition had been brought to the lessor's attention and he had agreed to repair the same, or the lessor had assumed the duty of making repairs. The doctrine of *caveat emptor* ordinarily applies, and the lessor is not liable unless the lessee shows that there was a latent defect known to lessor, or of which he should have known, and that the lessee was unaware of, or could not by the exercise of ordinary dili- gence discover, the defect, the concealment of which would be an act of bad faith on the part of the lessor." 5 Strong 2d, N. C. Index, Landlord and Tenant, § 8, pp. 162-163.

[7]    An understanding of the duty owed by defendant Taylor can be gleaned from *Pafford v. Construction Co.,* 217 N.C. 730, 9 S.E. 2d 408. There the defendant was the occupant of the premises, a contractor who was constructing the building. The Court described the duty owed by the owner or occupant of a building to a licensee:

> "The owner or person in possession of property is ordi- narily under no duty to make or keep property in a safe condition for the use of a licensee or to protect mere li- censees from injury due to the condition of the property, or from damages incident to the ordinary uses to which the premises are subject. There is no duty to provide safe- guards for licensees even though there are dangerous holes, pitfalls, obstructions or other conditions near to the part of the premises to which the permissive use extends. Neither is the owner or person in charge ordinarily under any duty to give licensees warning of concealed perils, although he might, by the exercise of reasonable care, have discovered the defect or danger which caused the injury. It follows that, as a general rule, the owner or person in charge of

Clarke v. Kerchner

property, is not liable for injuries to licensees due to the condition of the property, or as it has been expressed, due to passive negligence or acts of omission. [Citations omitted.] The duty imposed is to refrain from doing the licensee willful injury and from wantonly and recklessly exposing him to danger."

The duty described above is imposed on owner (defendants Kerchner) and occupant (defendant Taylor) when the premises are controlled by the tenant and the injury is caused by a defective condition of the premises, rather than by affirmative, active negligence. The evidence, taken in the light most favorable to the plaintiff, was not sufficient to be considered by the jury on the question of breach of the common law duty by defendants. There was no evidence that either defendant willfully injured the plaintiff, or wantonly or recklessly exposed her to danger.

[8]   Appellant contends that a violation of the Greensboro Housing Code is negligence *per se,* and that once proof of a violation is introduced, the case should go to the jury on the question of proximate cause. For the purpose of discussing this theory, we assume, but explicitly do not decide, that plaintiff presented evidence sufficient to be considered by the jury on the questions of defendants' failure to comply with provisions of the ordinance. According to appellant's theory, the purpose of the Greensboro Housing Code is to protect life and limb; therefore, it is a safety statute which imposes upon owner and occupant a duty to maintain the premises they own or occupy in a safe condition as required by the maintenance standards; a deviation from the maintenance standards set out therein (a breach of duty) causing injury to a person on the premises would produce liability for owner and occupant, regardless of the status of the person injured under the common law rules. In support of that theory, appellant cites numerous cases in which violation of a municipal ordinance was held to be negligence *per se,* among them *Bell v. Page,* 271 N.C. 396, 156 S.E. 2d 711. In *Bell,* a nine-year-old boy drowned in a motel swimming pool which the evidence tended to show was not being maintained in accordance with a municipal ordinance of Washington, N. C. The court held that the ordinance was a safety statute, and that a violation of the ordinance would be negligence *per se,* despite the fact that the boy was a trespasser. "The primary purpose and

Clarke v. Kerchner

intent of said ordinance in imposing such legal duty on persons maintaining swimming pools was to provide protection for children without reference to whether they were legally entitled to use the pool." *Bell v. Page, supra.* We detect several distinctions between the housing code involved in this case and the safety statutes involved in *Bell* and other cases cited by appellant. While there was no doubt in those cases that the purpose of the statute or ordinance was to impose a standard of care, there is no indication that the housing code being considered was so intended. The stated purpose of the Greensboro Housing Code is " . . . to arrest, remedy and prevent the decay and deterioration of places of habitation and to eliminate blighted neighborhoods by providing minimum requirements for places of habitation for the protection of the life, health, welfare, safety and property of the general public and the owners and occupants of places of habitation." The primary purpose and intent of this ordinance was not to impose a legal duty on persons owning or occupying housing for the protection of their guests regardless of whether owner or occupant would otherwise owe them the same duty. The purpose is "to arrest, remedy and prevent the decay and deterioration of places of habitation and to eliminate blighted neighborhoods. . . . " The method for improving housing in Greensboro is "by providing minimum requirements." Although N. C. Gen. Stat. 14-4 provides that violation of a city ordinance is a misdemeanor, the ordinance in question is not penal in nature. It is a remedial statute; if a building is found to be unfit for human habitation, it may be closed until repairs are made. Finally, if the statute were the standard of care by which owners of buildings were judged regardless of whether the area complained of was within the owner's control, the result would be either an unfair burden on the landlord (requiring him to maintain an area he could not enter), or an invasion of the domain of the tenant in his leased premises. For these reasons, we do not think this ordinance imposes upon the landlord (who does not even have the duty to repair the premises, *Thompson v. Shoemaker, supra*), a duty to maintain the premises in a safe condition. Nor does the ordinance alter the duty owed by the tenant.

Cases from other jurisdictions support the view that provisions in a city's housing code requiring maintenance by the

owner or occupant or both do not change the common law duties of landlord and tenant unless the intention of the legislative body to do so is explicitly stated. In one case plaintiff, a tenant's guest, had fallen off some steps and was suing the lessor. The jury was instructed that the defendant lessor would be guilty of negligence if he failed to comply with a statute requiring properly maintained handrails. The appellate court said if they gave the statute that effect, they "would be extending it to create a new area of civil liability in the relationship between landlord and tenant." *Fechtman v. Stover,* 139 Ind. App. 166, 199 N.E. 2d 354. Another case in which the standard of care as explained to the jury in the charge was based on statutory standards of care is *Tair v. Rock Investment Co.,* 139 Ohio St. 629, 41 N.E. 2d 867. The court held that the city ordinance did not set the standard of care for several reasons, among them that the statute did not distinguish demised premises from those used in common. The court said, "[I]f the ordinance were interpreted as an intended modification of the established rule, as contended by the plaintiff, the civil liability of a landlord would be the same irrespective of whether possession and control of the premises were retained by him. A majority of the members of this court are of the opinion that if any such change is to be injected into the law, it should be based upon express legislative enactment and not upon judicial inference." In *Corey v. Losse,* 297 S.W. 32 (Mo. 1927), plaintiff, age two years, fell from a porch when a banister came loose. Plaintiff's mother, the tenant, had frequently notified the landlord of the condition, but the lease did not require the landlord to repair. An ordinance of St. Louis said: "It shall be the duty of every owner, trustee or lessee of every tenement house to provide for and maintain the same in all parts in good repair." The court explained, quoting from *Burnes v. Fuchs,* 28 Mo. App. 279, 282: "[A]s between the owner and the city, the obligation under such a police regulation may well rest upon the owner; and yet, as between the owner and his tenant, the rule of the common law will prevail which casts the obligation upon the tenant." Other cases holding that such a statute does not modify the common law rules of liability are *Newman v. Sears, Roebuck & Co.,* 77 N.D. 466, 43 N.W. 2d 411, 17 A.L.R. 2d 694; *Garland v. Stetson,* 292 Mass. 95, 197 N.E. 679; *Johnson v. Carter,* 218 Iowa 587, 255 N.W. 864, 93 A.L.R. 774. Although some jurisdictions,

notably Michigan have held to the contrary, we regard the reasoning in the cases discussed as more persuasive.

Affirmed.

Chief Judge MALLARD and Judge PARKER concur.