STATE OF NORTH CAROLINA v. PAUL JACOB HENDERSON

No. COA06-590

(Filed 3 April 2007)

**1. Sexual Offenses— attempted first-degree sexual offense— overt act**

There was sufficient evidence of an overt act for submission of a charge of attempted first-degree sexual offense to the jury because: (1) the evidence tended to show that defendant removed his pants, walked into the room where his seven- or eight-year-old daughter was seated, stood in front of her, and asked her to put his penis in her mouth; (2) whenever the design of a person to commit a crime is clearly shown, slight acts in furtherance of the design will constitute an attempt; (3) the youth and vulnerability of children, coupled with the power inherent in a parent's situation of authority, creates a unique situation of dominance and control in which explicit threats and displays of force are not necessary to effect the abuser's purpose; (4) the evidence tended to show that defendant physically abused the victim's stepmother and the victim's pets, and defendant directly threatened the victim numerous times; and (5) violence is not a necessary component of an overt act, even in the context of attempted sexual offenses.

**2. Witnesses— expert testimony—registered nurse—child disclosure**

The trial court did not commit plain error in a multiple second-degree sexual exploitation of a minor, multiple taking indecent liberties with a minor, and attempted first-degree sexual offense case by allowing a registered nurse to testify as an expert in "child disclosure," because: (1) based upon her education and experience in the field of pediatrics and child interviewing, the nurse was better qualified than the jury; (2) regardless of the professional label, it is for the court to say whether the witness is qualified to testify as one skilled in the matter at issue, and there was sufficient evidence to support the determination that the

nurse was qualified to testify about the nature, content, and timing of the child's disclosure of the sexual abuse allegations including how that disclosure related to characteristic behavior of children; (3) the real test of the competency of the witness does not rest upon the fact that he belongs to a certain profession; (4) even if the trial court erred, the error could not have prejudiced defendant since this testimony was almost entirely repetitive of the testimony of other witnesses, all of which was properly admitted; and (5) the evidence against defendant was overwhelming such that there was no reasonable possibility that a different verdict would have been reached at trial.

Appeal by defendant from judgments entered 4 November 2005 by Judge W. Erwin Spainhour in Cabarrus County Superior Court. Heard in the Court of Appeals 7 December 2006.

*Attorney General Roy A. Cooper, III, by Assistant Attorney General Anne M. Middleton, for the State.*

*J. Clark Fischer, for the defendant-appellant.*

JACKSON, Judge.

Paul Jacob Henderson ("defendant") was indicted for seven counts of second-degree sexual exploitation of a minor, three counts of taking indecent liberties with a minor, and one count of attempted first-degree sexual offense. The charges stem from defendant's actions with his daughter, M.H.

M.H. was born on 23 June 1994 and was eleven years old at the time of the trial. Defendant and M.H.'s mother divorced when M.H. was very young. Defendant remarried and moved with his wife to South Carolina. At the time, M.H. was living with her grandmother, and she would visit her father and stepmother on occasional weekends. During one such visit, M.H. awoke to find defendant touching "around [her] front private." She did not tell anyone, however, because she was too afraid.

A couple years later, defendant and his wife moved to Midland, North Carolina, and M.H. moved in with them. M.H. was approximately seven years old at the time. M.H. testified that defendant would sleep in M.H.'s room and in her bed, even though M.H. did not ask him to sleep with her, and M.H. explained that defendant would touch her when he was in her bed. Defendant's wife was

unaware of the touching and believed defendant slept with M.H. simply because he loved her. Defendant once told his wife, "I think I love my daughter too much," and explained "you don't understand how much I love [M.H.]."

Less than two years later, defendant's wife moved out because, according to M.H., "they were having so many arguments, he was threatening to kill her, and just a lot of other abusements [sic]." M.H. recalled waking up at night and hearing defendant and her stepmother arguing and fighting. M.H. testified that she saw her stepmother with "[a] busted lip, a loosened tooth, and a lot of bruises." After M.H.'s stepmother moved out, defendant slept primarily in M.H.'s room. M.H. explained that she was nine years old and in the fourth grade at the time.

After defendant's wife moved out, a babysitter frequently cared for M.H. while defendant, a professional truck driver, was on overnight trips. M.H.'s mother moved in with defendant for a short time to care for M.H., but she soon moved out, leaving M.H. alone with defendant. M.H. recalled that there were times when defendant made her feel "uncomfortable." Specifically, M.H. testified that she would wake up and defendant would be in her bed and "rubbing and putting pressure" on her "front private" with his hands. Both defendant and M.H. would be undressed, at least from the waist down, during such instances. M.H. explained that she would wake up and discover that defendant had taken off her clothes. After he took off her clothes, "[h]e would wet his fingers or put lotion on his fingers and would rub them on [M.H.'s] front private." Defendant stated that the lotion was a medicine and that M.H. would not let defendant apply it so he would try to apply it to her while she was sleeping. M.H., however, described the differences in the two lotion tubes and explained that the lotion that defendant applied was not medicine but "regular hand lotion."

This was not the only situation when defendant touched M.H. Defendant frequently would rub M.H.'s rear in "circular motions" or grab her rear, telling M.H. that she "had a pretty butt." M.H. also testified that one time, defendant placed a warm washcloth on her chest and rubbed her chest in circles. M.H.'s chest had been hurting, but she had not asked defendant to do this. During this incident, as well as the numerous instances when defendant would wake M.H. by touching her front private, M.H. would tell defendant to stop. Defendant refused to stop, however, and generally, if the incident occurred at night, he would tell M.H. to go back to sleep.

M.H. further testified that in addition to touching M.H. with his hands, defendant would touch M.H. with "[h]is front private." M.H. described one such incident: "I remember him making me stand on a stool, and he videotaped this, and he rubbed his front private on mine." M.H. explained that defendant asked her to stand on the stool to "make [M.H.] look more grown up." At the time, neither M.H. nor defendant had clothes on from the waist down, and again, M.H. would tell defendant to stop but to no avail. According to M.H., this was not the only incident in which defendant videotaped her. Defendant once had M.H. take off her clothes while in a swimming pool, and he filmed her while she, per his demand, floated back and forth on an inflatable bed in the pool.

Defendant also tried to get M.H. to touch him. While in bed one time, he asked her to touch "[h]is front private" with her hands. M.H. also described another time when defendant asked M.H. to perform fellatio on him. M.H. described that it was during the daytime, and they were in the living room of defendant's house. Defendant, naked from the waist down, stood in front of M.H., who was sitting on the couch. M.H. explained that "he pretty much asked me to put his front private in my mouth," except that he did not use the word "private" but rather the word "D-i-c-k," which M.H. spelled out because she was too embarrassed to say in public. Defendant denied ever asking his daughter to perform fellatio on him, and he stated, "I would be an absolute idiot to do something like that."

In addition to touching M.H. and asking M.H. to touch him, defendant showed M.H. pornographic pictures on the house computer. The images were of adults as well as children—some as young as five years old and some M.H.'s age—engaging in sexual activity. This occurred both while M.H.'s stepmother lived in the house and also after she moved out.

During her testimony, M.H. explained that she "knew there was something wrong" with the way defendant treated her, but she did not immediately tell anyone what defendant did because she "was too embarrassed and . . . too afraid." Defendant frequently drank alcohol to excess, and after drinking, "[t]he littlest thing could make him really mad." Defendant not only physically abused M.H.'s stepmother while she lived in the house, but he also threatened to harm M.H.'s cats, and M.H. stated that one time, "he threw my dog up against the wall."

Eventually, M.H. told her grandmother what had been occurring. M.H. stated, "Mamaw, daddy's going to hurt me," and when the grandmother inquired further, M.H. explained that defendant had been touching her between her legs. M.H.'s grandmother then contacted the Department of Social Services ("DSS"), and M.H. began attending counseling sessions, which lasted for the eighteen months leading up to the trial.

Lieutenant Tim Parker ("Lieutenant Parker"), a sixteen-year veteran of the Cabarrus County Sheriff's Office, investigated defendant's case after being contacted by DSS on 6 May 2004. On 7 May 2004, Lieutenant Parker obtained and executed a search warrant at defendant's residence. Defendant was at the residence at the time Lieutenant Parker arrived with three other detectives from the sheriff's office. Lieutenant Parker explained that he was attempting to locate a photograph taken of M.H. nude in the bathtub. Defendant showed the officers such a picture of M.H. at approximately age two. After explaining that the picture at issue depicted M.H. at age nine, defendant denied the existence of such a photograph. The officers stated that they also were attempting to locate pornographic videos that defendant allegedly had allowed or forced M.H. to watch. Defendant consented to a search of the premises, and officers discovered several photographs of nude and partially nude female children, including M.H. Upon realizing that the officers had found the pictures, defendant exclaimed, "[O]h shit, these don't look good." Officers seized the photographs, several videos to check for pornographic material, and defendant's computer hard drive. After Lieutenant Parker "explained that officers have special programs and ways of checking computers that will allow law enforcement to retrieve any and all photographs on a computer even if they have been deleted," defendant confessed that the officers would find photographs on his computer, including some of children nude and engaged in sexual acts. Officers ultimately retrieved 1,858 pornographic images on defendant's computer, of which approximately 1,800 involved children. The files apparently had been deleted in May 2004.

Lieutenant Parker informed defendant that he would be in contact with defendant on the following Monday, but when Lieutenant Parker went to check in with defendant two days later, defendant's vehicles were gone, furniture had been moved from the house, and defendant could not be located. On 10 May 2004, Lieutenant Parker entered defendant into a national computer database of wanted fugitives, and on 28 May 2004, defendant was arrested after being discov-

ered at a hotel in Lancaster, South Carolina. Defendant had registered at the hotel under the assumed name "Johnny Ray."

At trial, Dr. Rosalena Conroy ("Dr. Conroy") testified as an expert in pediatric medicine specializing in child physical and sexual abuse. Dr. Conroy examined M.H. on 15 June 2004. Although there were no physical findings, Dr. Conroy noted that there are no physical findings in ninety to ninety-eight percent of sexual abuse cases. Dr. Conroy also explained that it is not unusual for a child not to tell the whole story the first time, often because the child is embarrassed. Dr. Conroy stated that "children will start to give more and more disclosures as they feel safe, as they feel believed . . . . Adding more details with time is a reflection of them being abused and feeling safe and feeling that people believe them."

Dr. Conroy's description of and explanation for the behavior of children when disclosing sexual abuse was echoed in the testimony of Nurse Cynthia Fink ("Nurse Fink"). Nurse Fink, tendered and received by the trial court as an expert in the field of child disclosure, interviewed M.H. prior to Dr. Conroy's examination. During the interview, M.H. marked on a picture places "where somebody had touched her that she liked or she didn't like or she just wasn't sure about." Nurse Fink testified that "[M.H.] marked her chest, which she called her boobs; her front privates, which she called her tutu, and on the back she marked what she called her tushy or rear." M.H. told Nurse Fink that her father—defendant—touched in those places and that she did not like it. M.H. also told Nurse Fink "that she didn't tell anybody about the touches because she was afraid [defendant] would hurt [her]." Overall, M.H. did not provide Nurse Fink with a lot of details but M.H. was consistent with what she told Nurse Fink, and it is not uncommon "for children to add details later on, as they know they're not going to get hurt."

On 4 November 2005, defendant was found guilty of attempted first-degree sex offense and all remaining counts. The trial court sentenced him to 251 to 311 months imprisonment for the attempted first-degree sex offense and to consecutive sentences on the remaining charges totaling 250 to 300 months. Defendant gave timely notice of appeal.

[1] On appeal, defendant first contends that the State failed to present evidence of any overt act by defendant and that, as a result, the trial court erred in submitting the charge of attempted first-degree sexual offense to the jury. We disagree.

At the close of the State's case-in-chief, defendant moved to dismiss the charge of attempted first-degree offense. As this Court has noted,

> [w]hen ruling on a motion to dismiss, the trial court must decide whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator of such offense. If so, the motion is properly denied. Evidence is viewed in the light most favorable to the State, giving the State the benefit of all reasonable inferences.

*State v. Wallace*, 179 N.C. App. 710, 718, 635 S.E.2d 455, 462 (2006) (quoting *State v. King*, 178 N.C. App. 122, 130-31, 630 S.E.2d 719, 724 (2006)).

Defendant was found guilty of attempted first-degree sexual offense pursuant to North Carolina General Statutes, section 14-27.4 The elements of first-degree sexual offense include "a sexual act by force and against the will of a victim under the age of thirteen years by a defendant at least twelve years old and at least four years older than the victim." *State v. Kivett*, 321 N.C. 404, 415, 364 S.E.2d 404, 410 (1988) (citing N.C. Gen. Stat. § 14-27.4 (1986)). "The term 'sexual act' is defined as 'cunnilingus, fellatio, anilingus, and anal intercourse' or 'the penetration, however slight, by any object into the genital or anal opening of another person's body.' " *State v. Wilkinson*, 344 N.C. 198, 215, 474 S.E.2d 375, 384 (1996) (quoting N.C. Gen. Stat. § 14-27.1(4) (1988)). In the case *sub judice*, defendant, who was forty-nine years old at the time of the offense, attempted to have his seven- or eight-year-old daughter perform fellatio on him. As our Supreme Court has stated, "[t]he elements of an attempt to commit any crime are: (1) the intent to commit the substantive offense, and (2) an overt act done for that purpose which goes beyond mere preparation, but (3) falls short of the completed offense." *State v. Miller*, 344 N.C. 658, 667, 477 S.E.2d 915, 921 (1996).

Defendant's argument on appeal is limited solely to whether there was evidence of an overt act committed by defendant. Defendant has not challenged any of the other elements of attempted first-degree sexual offense, and as such, review is limited to the issue of whether there was evidence of an overt act. *See* N.C. R. App. P. 28(a) (2006) ("Review is limited to questions so presented in the several briefs.").

The evidence in the instant case tended to show that defendant removed his pants, walked into the room where his seven- or eight-

year-old daughter was seated, stood in front of her, and asked her to put his penis in her mouth. Defendant contends that from this evidence, "the most damning conclusion is only that [he] asked his daughter to perform oral sex on him." Defendant overlooks the fact that " 'whenever the design of a person to commit a crime is clearly shown, *slight acts* in furtherance of the design will constitute an attempt.' " *State v. Bell*, 311 N.C. 131, 141, 316 S.E.2d 611, 616 (1984) (emphasis added) (quoting 21 Am. Jur. 2d *Criminal Law* § 159 (1981)).

In *State v. Sines*, 158 N.C. App. 79, 579 S.E.2d 895, *cert. denied*, 357 N.C. 468, 587 S.E.2d 69 (2003), this Court held that "[d]efendant's placement of his penis in front of victim's face, coupled with his demand for oral sex, comprise an overt act sufficient to satisfy the second element of attempt." *Sines*, 158 N.C. App. at 85, 579 S.E.2d at 899. Defendant attempts to distinguish the markedly similar facts in the instant case from the facts in *Sines* on the ground that his conduct fell short of the sexually assaultive behavior in *Sines*. However, as the State correctly notes, "[t]he youth and vulnerability of children, coupled with the power inherent in a parent's position of authority, creates a unique situation of dominance and control in which explicit threats and displays of force are not necessary to effect the abuser's purpose." *State v. Etheridge*, 319 N.C. 34, 47, 352 S.E.2d 673, 681 (1987). Additionally, the evidence tended to show that defendant physically abused the victim's stepmother and the victim's pets, and defendant directly threatened the victim numerous times, even threatening to "slap the taste out of her mouth." It is not surprising then that the victim repeatedly stated that she was afraid of defendant.

Defendant's attempt to distinguish his case from *Sines* based upon the absence of assaultive or violent behavior is not only factually inaccurate, however, but also is legally inaccurate. Our precedents demonstrate that violence is not a necessary component of an overt act, even in the context of attempted sexual offenses. *See, e.g., State v. Powell*, 74 N.C. App. 584, 328 S.E.2d 613 (1985) (defendant entered victim's bedroom at night, undressed, and began fondling his genitalia).

In sum, there is substantial evidence of an overt act, particularly when viewed in the light most favorable to the State, and therefore, the trial court did not err in submitting the charge of attempted first-degree sexual offense to the jury. Accordingly, defendant's assignment of error is overruled.

**[2]** In his second argument, defendant contends that the trial court committed plain error by allowing Cynthia Fink, a registered nurse, to testify as an expert in "child disclosure." Specifically, defendant argues that this is an improper area for expert testimony and that Nurse Fink was not qualified as such an expert.

"It is undisputed that expert testimony is properly admissible when such testimony can assist the jury to draw certain inferences from facts because the expert is better qualified." *State v. Bullard*, 312 N.C. 129, 139, 322 S.E.2d 370, 376 (1984). "[A] trial court's ruling on the qualifications of an expert or the admissibility of an expert's opinion will not be reversed on appeal absent a showing of abuse of discretion." *State v. Fuller*, 166 N.C. App. 548, 560, 603 S.E.2d 569, 577 (2004) (quoting *Howerton v. Arai Helmet, Ltd.*, 358 N.C. 440, 458, 597 S.E.2d 674, 686 (2004)). "The test for abuse of discretion is whether the trial court's ruling was manifestly unsupported by reason or was so arbitrary that it could not have been the result of a reasoned decision." *State v. Chapman,* 359 N.C. 328, 348-49, 611 S.E.2d 794, 811 (2005) (internal citations, alteration, and quotation marks omitted). Defendant, however, did not object at trial to the validity of the field of child disclosure or to Nurse Fink's qualifications or testimony, and accordingly, our review is limited to plain error. *See id.* at 349, 611 S.E.2d at 812; *see also State v. Stancil*, 355 N.C. 266, 267, 559 S.E.2d 788, 789 (2002) (per curiam).

Plain error has been defined as "error so fundamental as to amount to a miscarriage of justice or which probably resulted in the jury reaching a different verdict than it otherwise would have reached.' " *Chapman*, 359 N.C. at 349, 611 S.E.2d at 812 (internal citations and quotation marks omitted); *see also State v. Howard*, 158 N.C. App. 226, 233, 580 S.E.2d 725, 731, *disc. rev. denied and appeal dismissed*, 357 N.C. 465, 586 S.E.2d 460 (2003). Additionally, "the plain error rule . . . is always to be applied cautiously and only in the exceptional case." *State v. Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983) (quoting *United States v. McCaskill,* 676 F.2d 995, 1002 (4th Cir.), *cert. denied*, 459 U.S. 1018, 74 L. Ed. 2d 513 (1982)). We thus review defendant's argument concerning Nurse Fink's testimony for plain error, and as such, we "must study the whole record to determine if the error had such an impact on the guilt determination, therefore constituting plain error." *State v. Brigman*, 178 N.C. App. 78, 91, 632 S.E.2d 498, 507, *appeal dismissed and disc. rev. denied*, 360 N.C. 650, 636 S.E.2d 813 (2006).

Nurse Fink, a certified registered nurse since 1979, testified that in 2004 she was employed as the Clinical Director of Pediatrics at the NorthEast Medical Center as well as at the Children's Advocacy Center at the NorthEast Medical Center. Nurse Fink received her bachelor of science in nursing from the Medical University of South Carolina, and she received her master of science and nursing, with a maternal/child concentration, from the University of North Carolina at Charlotte. Nurse Fink performed her residency at Piedmont Pediatrics in Concord, North Carolina, and she received a pediatric nurse practitioner certificate from Duke University. Additionally, Nurse Fink has taught numerous courses, both class and clinical, at The Louise Harkey School of Nursing at Cabarrus College of Health Sciences in Concord, North Carolina. Nurse Fink also testified that she had extensive training and experience in interviewing children, including learning how to talk to children without leading them, and over her career, she has interviewed thousands of children. Based upon her education and experience in the field of pediatrics and child interviewing, we find that Nurse Fink was better qualified than the jury, and therefore, Nurse Fink was qualified to testify as an expert.

Although defendant contends there is no such field of expertise entitled "child disclosure," our Supreme Court has explained that "*[r]egardless of the professional label,* it is for the court to say whether the witness is qualified to testify as one skilled in the matter at issue, and his finding will not be disturbed when there is evidence to support it, and the discretion has not been abused." *Bullard*, 312 N.C. at 144, 322 S.E.2d at 378 (emphasis added) (quoting *State v. Moore*, 245 N.C. 158, 164, 95 S.E.2d 548, 552 (1956)); *see also State v. Smith*, 221 N.C. 278, 287, 20 S.E.2d 313, 319 (1942) ("[T]he real test of the . . . competency of the witness . . . *does not rest upon the fact that he belongs to a certain profession* . . ., but upon a principle that must lie behind the competency of all opinion testimony—the fact that the witness has special experience in matters of the kind, and his conclusions may, therefore, be helpful to the less experienced jury." (emphasis added)). In *State v. Bullard*, this Court noted that regardless of whether or not the field of physical anthropology—specifically, "the comparison and identification of unknown footprints with known footprints [and] footprint impressions"—was a proper field of expertise, "there was evidence to support the trial judge's finding that [the witness] was qualified to testify about the subject footprints." *Bullard*, 312 N.C. at 143-44, 322 S.E.2d at 378. Similarly, regardless of whether or not "child disclosure" is a proper field of expertise, there

was sufficient evidence to support the trial court's determination that Nurse Fink was qualified to testify about the nature, content, and timing of M.H.'s disclosure of the sexual abuse allegations, including how that disclosure related to characteristic behavior of children.

Furthermore, "[t]he burden is on the party who asserts that evidence was improperly admitted to show not only error but also to show that he was prejudiced by its admission." *State v. Atkinson*, 298 N.C. 673, 683, 259 S.E.2d 858, 864 (1979). In the instant case, the substance of Nurse Fink's testimony reiterated what Dr. Conroy already had stated regarding child disclosure of sexual abuse, and defendant has not assigned error to Dr. Conroy's expert testimony. Therefore, even if the trial court erred, " 'the trial court's error could not have prejudiced defendant,' because this testimony was 'almost entirely repetitive of the testimony of [other witnesses], all of which was properly admitted.' " *State v. Parker*, 140 N.C. App. 169, 182, 539 S.E.2d 656, 665 (2000) (alteration in original) (quoting *State v. Washington*, 131 N.C. App. 156, 164, 506 S.E.2d 283, 288 (1998), *appeal dismissed and disc. rev. denied*, 350 N.C. 105, 533 S.E.2d 477 (1999)), *disc. rev. denied*, 353 N.C. 394, 547 S.E.2d 37, *cert. denied*, 532 U.S. 1032, 149 L. Ed. 2d 777 (2001).

Finally, the evidence against defendant was overwhelming. *See Brigman*, 178 N.C. App. at 91, 632 S.E.2d at 507. Defendant once told his wife, "I think I love my daughter too much," and M.H. testified consistently, at length, and in detail about the sexual abuse she endured over the course of several years while living with defendant. M.H.'s grandmother testified that M.H. told her that defendant had touched her inappropriately, and M.H.'s testimony was corroborated by numerous photographs in defendant's possession of nude and partially nude children, including pictures of M.H. Defendant initially denied possessing any such pictures, but when officers showed the photographs to him, he exclaimed, "[O]h shit, these don't look good." Evidence also demonstrated that defendant attempted to flee when he learned Lieutenant Parker would return to arrest him. During the flight, defendant lied to the hotel clerk by using an assumed name to check into the hotel. At trial, Deputy Lewis Burgess testified that approximately 1,800 images of child pornography were recovered from defendant's computer hard drive, and computer forensic evidence indicated that defendant had visited such websites as "Shocking Underage Porno," "Incest Portal," and "Real Underage Porno." In sum, "[w]e cannot conclude that there was a 'reasonable possibility that a different result would have been reached by the

jury.' " *Id.* (quoting *State v. Aguallo*, 318 N.C. 590, 599-600, 350 S.E.2d 76, 82 (1986)). Accordingly, this assignment of error is overruled.

For the foregoing reasons, we find that defendant's trial was free of reversible error.

No Error.

Judges GEER and LEVINSON concur.