STATE OF NORTH CAROLINA v. JULIUS STEWART SUMMRELL

No. 53

(Filed 15 November 1972)

1. **Disorderly Conduct and Public Drunkenness § 1— disorderly conduct statute — unconstitutional provisions**

    Provisions of the disorderly conduct statute which make it unlawful to cause a public disturbance by wilfully or wantonly creating "a hazardous or physically offensive condition" or by "offensively coarse" utterances and acts such as "to alarm and disturb persons present" *are held* unconstitutionally vague and overbroad. Former G.S. 14-288.4(a)(2) and (3).

2. **Constitutional Law § 18— freedom of speech**

    The public expression of ideas may not be prohibited merely because the ideas are offensive, disturbing, or alarming to some hearers.

3. **Constitutional Law § 18— statute prohibiting constitutionally protected speech**

    A statute which defines proscribed activity so broadly that it encompasses constitutionally protected speech cannot be upheld in the absence of authoritative judicial limitations.

4. **Indictment and Warrant § 12— conviction in district court — amendment of warrant in superior court**

    In an appeal to the superior court from a disorderly conduct conviction in the district court, the trial court properly allowed the State to amend the warrant to comply with the trial court's construction of the disorderly conduct statute.

5. **Disorderly Conduct and Public Drunkenness § 1— disorderly conduct statute — acts or utterances likely to provoke breach of peace — constitutionality**

    Provision of the disorderly conduct statute proscribing acts and language likely to provoke a breach of the peace is constitutional. Former G.S. 14-288.4(a)(2).

6. **Disorderly Conduct and Public Drunkenness § 1— hospital emergency room — public place**

    A hospital emergency room is a public place within the purview of the disorderly conduct statute.

7. **Disorderly Conduct and Public Drunkenness § 2— disorderly conduct in hospital emergency room — sufficiency of evidence**

    The State's evidence was sufficient for the jury on the issue of defendant's guilt of disorderly conduct by acts and language calculated to provoke a breach of the peace where it tended to show that defendant was under the influence of an intoxicant while in a hospital emergency room, that he refused medical attention from a physician

solely because the physician was white, and that when he was informed that a black doctor whom he had demanded was not immediately available, he began shouting profanities, cursing all whites, and loudly voicing unfounded complaints.

8. **Arrest and Bail § 6— resisting arrest without warrant — legality of arrest**

Defendant could not legally resist his arrest for the misdemeanor of disorderly conduct where the arresting officer had reasonable grounds to believe that defendant had committed that crime in his presence and thus was empowered to arrest defendant without a warrant. G.S. 14-223; G.S. 15-41(1).

9. **Criminal Law § 171— error relating to one charge — concurrent identical sentences — harmless error**

Erroneous instruction on a disorderly conduct charge was harmless where the sentence imposed for disorderly conduct was made to run concurrently with an identical sentence imposed for the offense of resisting arrest.

10. **Indictment and Warrant § 8— charges of resisting and assaulting officer — election by the State**

The trial judge was not required to make the State elect between the charges of resisting an officer and assaulting an officer at the beginning of the trial and before any evidence had been introduced; however, the trial court should have required such an election at the conclusion of the evidence where the evidence showed that the assaults were the means by which the officer was resisted.

11. **Constitutional Law § 34; Criminal Law § 26— double jeopardy — multiple punishments for same offense**

The constitutional guaranty against double jeopardy protects a defendant from multiple punishments for the same offense.

12. **Criminal Law §§ 26, 171— assaulting and resisting officer — double jeopardy — concurrent sentences — arrest of judgment**

Defendant's constitutional right against double jeopardy was violated when he was convicted of resisting an officer and assaulting an officer based on the same conduct, and the judgment imposed for assaulting an officer will be arrested even though concurrent, identical sentences were imposed in each case.

APPEAL by defendant under G.S. 7A-30(1) (1969) from the decision of the Court of Appeals, 13 N.C. App. 1, 185 S.E. 2d 241 (1971), which found no error in his trial before *Judge Robert M. Martin* at the 10 May 1971 Session of PITT; docketed and argued at the 1972 Spring Term as Case No. 26.

On 14 July 1970 defendant was arrested upon three warrants which charged that on 6 July 1970 he committed three separate offenses:

(A) Warrant No. 813, *Disorderly conduct,* a violation of G.S. 14-288.4(a) (1) (2) (3) (1969), in that while on the premises of Pitt County Memorial Hospital, a public place, he did unlawfully and wilfully (1) engage "in fighting and in violent and threatening behavior," and (2) "did use vulgar, profane and abusive language in such a manner as to so arouse the average person as to create a breach of the peace, alarm and disturb persons present," and (3) "did create a hazardous and physically offensive condition."

(B) Warrant No. 812, *Resisting an officer,* a violation of G.S. 14-223 (1969), in that he "did unlawfully, wilfully, resist, delay & obstruct B. F. Phillips, a police officer . . . of the City of Greenville, N. C., by striking, jerking the officer's pistol, & fighting said officer [at a time when] such officer was discharging his duty, to wit: attempting to hold defendant in custody after arresting him."

(C) Warrant No. 811, *Assaulting a public officer,* a violation of G.S. 14-33(b) (6) (1969), in that he "did unlawfully, and wilfully, commit & assault & battery upon B. F. Phillips, a police officer . . . of the City of Greenville, N. C., by striking said officer with his fist, attempting to take his pistol, threatening to kill him with his pistol, and kicking him on his head, neck & body . . . [at a time when] such officer was discharging a duty of his office, to wit: attempting to hold defendant in custody after arresting him."

On 12 August 1970, in the District Court of Pitt County, defendant was found guilty as charged in each warrant. From sentences totaling nine months, he appealed to the Superior Court, where he was tried *de novo.*

In the Superior Court, when the case was called for trial, defendant made the following motions: (1) That the State be required to elect between the charges of resisting an officer and assaulting an officer "or, in the alternative, that the warrants be quashed for duplicity . . . because [the charges] arise out of the same transaction and involve the same incident"; (2) that defendant be allowed to see any and all statements which the State took from any person during the course of its investigation of the charges against him because "the State may have some exculpatory statements"; (3) that the warrant charging disorderly conduct be quashed upon the ground that

G.S. 14-288.4(a) (1) (2) (3) is "overly broad and vague" and therefore unconstitutional.

Judge Martin overruled the first motion. He also denied the second, but granted defendant's counsel permission and time to interview each of the State's witnesses. On the third motion, he struck from the warrant charging disorderly conduct, the third count, "did create a hazardous and physically offensive condition." He denied the motion to strike counts (1) and (2), but announced that he would interpret G.S. 14-288.4(a) (2) as if that section read "makes any offensive coarse utterance, gesture or display or uses abusive language in such manner as to so arouse the average person as to create a breach of the peace." At the time he made this announcement, Judge Martin gave the solicitor permission to amend the warrant, so that it would conform to this interpretation. The solicitor made the amendment prior to the verdict by striking from count (2) the final phrase "alarm and disturb persons present."

Defendant entered pleas of not guilty to all charges and the trial proceeded. The State's evidence tended to show:

About 4:30 p.m. on 6 July 1970 defendant Summrell, a twenty-one-year-old Negro male, was a passenger in his automobile, which was being driven on Fifth Street in Greenville by Kelley Wooten. At an intersection a vehicle operated by J. A. Turnage collided with defendant's vehicle. Just before the collision Turnage observed defendant "half in and half out of the front window." Patrolman Barley F. Phillips, a twenty-seven-year-old officer who had been on the police force for three years, came to the scene to investigate the accident.

Defendant and Wooten were sent to the Pitt County Memorial Hospital. Turnage, who was not injured, accompanied Patrolman Phillips to the hospital so that the officer's investigation could be completed there. After questioning Turnage (whom he "charged"), Phillips went to the emergency room. There he obtained permission from Dr. Vick, the surgeon on call, and Miss Ruth Shaw, the nurse in charge, to talk to defendant and Wooten. He found them side by side on separate beds in a treatment cubicle.

Miss Shaw had previously tried to get a history from defendant in order to call a doctor but, after giving his name, defendant refused to divulge any further information. How-

ever, he was complaining of low back pain; so she called Dr. Vick, who came in to see defendant. Defendant refused to permit Dr. Vick, a white physican, to examine him. He ordered him out and demanded Dr. Best, a black doctor. Defendant said, "I want a doctor; you white folks don't care a thing about us Negroes. You're going to let me lay here and die." Miss Shaw immediately called both Dr. Best's office and his home; he was not at either place. When she reported to defendant that she had been unable to reach Dr. Best but would keep trying, he "got real indignant. He was cussing and saying that he was in a lot of pain and he couldn't get any attention"; that "he was dying and nobody would get a doctor for him."

It was at this juncture that Officer Phillips came into the emergency room. Miss Shaw testified that defendant was cursing and using foul language both before and after the officer came in. She told Phillips that he had her permission to talk to defendant but he had refused any treatment from Dr. Vick. Phillips, who had heard Miss Shaw trying to locate Dr. Best, assured defendant that they would have Dr. Best there as soon as he could be reached. When Phillips attempted to question defendant his reply was, "I'm not going to tell you a damn thing and don't nobody else tell him anything." Defendant's unusually loud voice was heard by the patients waiting outside the emergency room.

Phillips turned his attention to Wooten but defendant was making so much noise, "using profane language in the process of boisterous talking," he could not take a statement from Wooten. Phillips heard him say to Miss Shaw, in a loud and boisterous manner, "Get out of my face, white woman." He ordered her out and she left. A woman patient, waiting to be seen in the emergency room, was visibly disturbed by defendant's comments and conduct. Miss Shaw said she herself was disturbed but not frightened.

Because of defendant's profanity and loud talk, Phillips found it impossible to get a statement from Wooten or to finish his investigation. Phillips advised defendant that if he did not quiet down he would "have to arrest him for disorderly conduct and carry him downtown." Defendant's reply was that the officer wouldn't carry him "any G. . d . . . where." Phillips then went to the telephone at the nurses' station and requested the desk officer at the police department to procure a

---

State v. Summrell

---

warrant for defendant's arrest and send it to him at the hospital. He then informed defendant he was under arrest for disorderly conduct and procured permission from Dr. Vick and Miss Shaw to take Wooten into another room so that he could complete his investigation of the accident. Wooten accompanied the officer across the hall, but they could still hear defendant's loud and boisterous language as Phillips attempted to write down Wooten's replies to his questions.

In the meantime, defendant's mother had arrived and was trying, without success, to get him "to lay there and be quiet." His reply to her requests was, "That's the trouble now. We've been quiet too long." He said he was going to get out of "this damn hospital" and asked someone to undo the strap which Miss Shaw had placed across him so that he could not "roll off." Shortly thereafter a commotion in the hall terminated Phillips' attempts to question Wooten, and he observed defendant and his mother outside the emergency room. Phillips told defendant to go back and lie down, that he was under arrest and that the hospital had not released him. Defendant, saying he was going home, advanced toward Phillips, who had blocked the door.

R. C. Little, who was waiting for a doctor in the lobby outside the emergency room, testified that defendant's face at this time had "a terrible look"; that he said to Phillips in a loud voice, "I'll kill you" and Phillips grabbed defendant's arm; that a general scuffle followed and the officer got out his blackjack; that defendant told Phillips not to hit him, and Phillips told him he would not hit him unless he had to.

The pushing and shoving continued. Defendant, who appeared to Little to have "an abnormal amount of strength," several times hit Phillips in the head area and took his blackjack, which he raised over the officer. Phillips kicked him away, drew his revolver, and told defendant to drop the blackjack or he would shoot. Defendant threw the blackjack; it struck the officer and felled him to the floor. Defendant then pushed his mother, who had attempted to come between him and Phillips, out of his way and went through the hospital's rear door. During this commotion women in the lobby were screaming and Little, thinking "a good run was better than a bad stay," left the lobby.

Phillips overtook defendant at the door and told him to stop, that he was under arrest. Defendant ignored the order,

and Phillips struck him in the back of the head with his service revolver, which he then returned to its holster. A scuffle ensued and Phillips again hit defendant in the head with the revolver and returned it to the holster. However, his efforts to restrain defendant were unsuccessful. Defendant made his way to the front parking lot where two black women were sitting in a Pontiac. He opened the door and got into the back seat as the two women screamed. At this point Jerome Streeter, defendant's half-brother, appeared and ran toward the Pontiac. As Streeter approached, defendant threw open the car door and charged Phillips. Both he and Streeter jumped on Phillips and tried to get his gun. As they scuffled, defendant said to Streeter repeatedly, "Get his gun; we'll kill the son of a bitch; get his gun."

The testimony of two laboratory workers, who watched the fight from a hospital window, tended to show: Two black men were beating the officer and struggling with him "over some object on his side." They finally threw him to the ground, flat on his back. Streeter got astride him and held his arms while defendant kicked him about the head, and "generally abused him." However, the officer finally "regained whatever object they were fighting over." Defendant was kicking him but he backed away as Phillips got up and raised his gun and fired. At the time the first shot was fired defendant was facing the officer. Whether he continued to face the officer as he backed away the witness could not be sure. Defendant "was moving easterly. He was not running. He would not have had to have his back turned in order to move any place that he was moving."

Phillips testified that, after kicking one man off him as he lay on the ground, he saw Streeter over him. As he got up he saw defendant was about ten feet away. His vision was blurred from the kicks he had received, but he saw defendant coming toward him with clinched fists. In fear of his life, his strength gone, he fired six consecutive shots at defendant. Defendant never flinched, turned or fell, and Phillips did not know whether he had hit or missed him. After the sixth shot he lost sight of defendant. He was reloading his gun when one Henry Brown came to him and said, "Everything is okay." Phillips then observed defendant lying on the ground. Brown and Streeter helped defendant into the hospital, and Phillips ran ahead and requested the receptionist to notify a police lieutenant that he "had just had to shoot a man."

Both Phillips and defendant were admitted to the hospital. Phillips remained overnight and for six weeks thereafter was treated for the cuts, abrasions and swelling of the face and neck he had received.

Defendant's hospital record disclosed that on 6 July 1970 his blood had an alcoholic content of .18 percent. It also contained this notation: "There are two wounds involving the lateral aspect of the right lower chest at the level of the ninth rib; one is in the posterior axillary line and one is in the anterior axillary line, slightly more medial than the anterior axillary line. The anterior one is the larger one, and is assumed for that reason to be the point of exit."

Dr. Vick, who operated on defendant after he was shot, did not testify. Interpretations of his entries were made by other witnesses. Although their testimony was doubtlessly intelligible to those who saw the demonstrations which accompanied it, expressions such as, "It means around here" and "Somewhere in this vicinity" do not enlighten those who see only the written record. The entry appears to say defendant was shot in the right side of the lower chest and that the entry wound was more to the back of a line drawn downward from the armpit and the exit wound was more to the front of that line. However, one medical expert testified that the quoted note did not necessarily "indicate that a bullet or object entered from someone's back and exited in the front."

In short summary, defendant's evidence tended to show:

In the emergency room defendant was upset, scared, and in pain. All the noises he made were merely complaints about his injury. He wanted no doctor except Dr. Best. Nurse Shaw spoke hatefully when she told him she could not get Dr. Best, and Officer Phillips had told him he had "better shut up and lay there." When he heard the officer call for the warrant he set out for Dr. Best's office, which was just across the street from the hospital. The officer never told him he was under arrest. He thought he could not be arrested until the warrant arrived. His only purpose in resisting the officer was to get treatment from Dr. Best before he had to go to jail. Outside the hospital he "flipped" Phillips only because the officer persisted in hitting him in the head with the gun. He and Streeter attempted to take the gun from Phillips because the officer was

"so mad" they feared he would shoot defendant. As defendant was returning to the hospital, he "glimpsed back" and Phillips shot him in his side, or his back, and in his wrist. In consequence, he lost half his liver and now has "loose leaders" in his arm.

Upon verdicts of guilty as charged in each case, the court imposed three concurrent sentences of six months. Defendant appealed to the Court of Appeals, which found no error in his trial. Defendant appealed to this Court, asserting that substantial constitutional questions are involved.

*Attorney General Morgan and Assistant Attorney General Magner for the State.*

*Chambers, Stein, Ferguson & Lanning by Charles L. Becton and Paul and Keenan for defendant appellant.*

SHARP, Justice.

Defendant, by his motion to quash the warrant upon which he was charged and convicted of disorderly conduct, challenged the constitutionality of the applicable sections of G.S. 14-288.4 (1969), the statute under which it was drawn. The court's denial of this motion raises the constitutional question upon which defendant appeals.

G.S. 14-288.4(b) provides: "Any person who *wilfully* engages in disorderly conduct is guilty of a misdemeanor punishable by a fine not to exceed five hundred dollars ($500.00) or imprisonment for not more than six months." (Emphasis added.)

G.S. 14-288.4(a), in pertinent part, provides: "Disorderly conduct is a *public disturbance* caused by any person who:

"(1) Engages in fighting or in violent, threatening, or tumultuous behavior; or

"(2) Makes any offensively coarse utterance, gesture, or display or uses abusive language, in such manner as to alarm or disturb any person present or as to provoke a breach of the peace; or

"(3) Wilfully or wantonly creates a hazardous or physically offensive condition. . . ." (Emphasis added.)

*Public disturbance* is defined by G.S. 14-288.1(8) (1969) to be: "Any annoying, disturbing, or alarming act or condition exceeding the bounds of social toleration normal for the time and place in question which occurs in a public place or which occurs in, affects persons in, or is likely to affect persons in a place to which the public or a substantial group has access. The places covered by this definition shall include, but not be limited to, highways, transport facilities, schools, prisons, apartment houses, places of business or amusement, or any neighborhood."

The foregoing sections are a part of Article 36A of Chapter 14 of the General Statutes of North Carolina. This Article was enacted by Chapter 869, N. C. Sess. Laws of 1969, Section 9 of which provides: "If any word, clause, sentence, paragraph, section, or other part of this Act shall be adjudged by any court of competent jurisdiction to be invalid, such judgment shall not affect, impair or invalidate the remainder thereof."

Defendant concedes that a person may be legally convicted of disorderly conduct under G.S. 14-288.4(a)(1) if he wilfully engages in fighting, violence, or conduct threatening immediate violence. His contentions with reference to the charge based upon this section (count one in the disorderly conduct warrant) will be discussed in considering the assignments of error relating to the charge.

With reference to Section (a)(2) of G.S. 14-288.4, the basis for the second count in the warrant charging disorderly conduct, defendant contends that this portion of the statute violates the First Amendment guaranty of free speech and section one of the Fourteenth Amendment. He argues that this section is "facially vague and overbroad"; that its imprecise and sweeping language not only encompasses speech protected by the First Amendment but is so indefinite that men of common experience and intelligence could not know in advance what utterances and conduct would fall within its prohibition.

[1] It must be conceded that all of Section (a)(3) and that part of Section (a)(2) which proscribes "offensively coarse" utterances and acts such as "to alarm and disturb persons present" are vague. *See In Re Burrus,* 275 N.C. 517, 531, 169 S.E. 2d 879, 888 (1969). Words and conduct which would alarm and disturb one person might not faze another, and conditions hazardous or physically offensive to some might not be so re-

garded by others. It is quite clear that, under the decision of the United States Supreme Court in *Gooding v. Wilson, 405* U.S. *518,* 31 L.Ed. 2d 408, 92 S.Ct. 1103 (1972), Section (a) (3) and that portion of Section (a) (2) referred to above are unconstitutionally vague and overbroad. In *Gooding,* the Court passed upon a Georgia statute providing that "[a]ny person who shall, without provocation, use to or of another, and in his presence . . . opprobrious words or abusive language, tending to cause a breach of the peace . . . shall be guilty of a misdemeanor." *Id.* at 519, 31 L.Ed. at 412, 92 S.Ct. at 1104. The decision was that the statute was "facially unconstitutionally vague and overbroad" and, in the absence of an authoritative construction by the Georgia court (1) narrowing its application to "fighting" words only, utterances tending to incite an immediate breach of the peace; and (2) excluding from its application speech, however vulgar or offensive, that is protected by the First and Fourteenth Amendments, that it was void.

**[2, 3]** It has long been established that under our Constitution the public expression of ideas may not be prohibited merely because the ideas are offensive, disturbing, or alarming to some hearers. *Street v. New York,* 394 U.S. 576, 592, 22 L.Ed. 2d 572, 585, 89 S.Ct. 1354 (1969). Any other rule would deny the opportunity for free political discussion which is so necessary to keep government responsive to the will of the people and to effect changes by lawful means. Some persons will always be alarmed, and perhaps disturbed, by the advocates of change. Thus, a statute which defines proscribed activity so broadly that it encompasses constitutionally protected speech, cannot be upheld in the absence of authoritative judicial limitations. *See Bachellar v. Maryland,* 397 U.S. 564, 25 L.Ed. 2d 570, 90 S.Ct. 1312 (1970); *Edwards v. South Carolina,* 372 U.S. 229, 9 L.Ed. 2d 697, 83 S.Ct. 680 (1963); *Terminiello v. Chicago,* 337 U.S. 1, 93 L.Ed. 1131, 69 S.Ct. 894 (1948); *Stromberg v. California,* 283 U.S. 359, 369, 75 L.Ed. 1117, 1123, 51 S.Ct. 532, 536, 73 A.L.R. 1484 (1931).

**[4]** Recognizing the vagueness and "overbreadth" of the "alarm and disturb" provision in Section (a) (2) and the hazardous or physically offensive provision in Section (a) (3), upon which the third count on the warrant was based, Judge Martin struck the third count and construed Section (a) (2) to prohibit only words and conduct likely to provoke ordinary men to violence. Thus, he deleted the obscuring verbage and left undisturbed

---

State v. Summrell

---

the statutes' proscription against acts and language calculated to bring on a breach of the peace. The State was given permission to amend the second count of the warrant to comply with this construction, and, before verdict the solicitor amended by striking therefrom the words "alarm and disturb persons present." This was permissible procedure. *State v. Fenner,* 263 N.C. 694, 140 S.E. 2d 349 (1965) ; *State v. Thompson,* 233 N.C. 345, 64 S.E. 2d 157 (1951).

Judge Martin's "construction of severability" was authorized by Section 9 of Ch. 869, N. C. Sess. Laws of 1969 previously quoted herein. Further, it is well settled in our law that a statute will not be construed so as to raise a question of its constitutionality "if a different construction, which will avoid the question of constitutionality, is reasonable." *Education Assistance Authority v. Bank,* 276 N.C. 576, 592, 174 S.E. 2d 551, 563 (1970).

There can be no doubt that the General Assembly intended to prohibit "fighting words," words tending to cause an immediate breach of the peace wilfully spoken in a public place, and that Judge Martin's interpretation accurately expressed the legislative purpose. At this point we note that the General Assembly by N. C. Sess. Laws, Ch. 668, § 1 (1971) deleted Section (a) (3) from G.S. 14-288.4 and rewrote Section (a) (2) so that it now reads "[m]akes or uses any utterance, gesture, display or abusive language which is intended and plainly likely to provoke violent retaliation and thereby cause a breach of the peace. . . . " There is no substantial difference between the 1971 revision and the 1969 version of Section (a) (2) as Judge Martin construed it.

"The right of [freedom of speech] is not an absolute one, and the State, in the exercise of its police power, may punish the abuse of this freedom." *Stromberg v. California, supra* at 368, 75 L.Ed. at 1123, 51 S.Ct. at 535. "The prime function of government is to preserve public order and keep the State tranquil." 1 Bishop, *Criminal Law* § 533 (9th ed. 1923). Thus, it has a paramount duty to maintain order not only in the streets but in schools, hospitals, and all public places. The Supreme Court has recognized this obligation. *Grayned v. Rockford,* 408 U.S. 104, 33 L.Ed. 2d 222, 92 S.Ct. 2294 (1972) ; *Colton v. Kentucky,* 407 U.S. 104, 32 L.Ed. 2d 584, 92 S.Ct. 1953 (1972) ; *Feiner v. New York,* 340 U.S. 315, 95 L.Ed. 295, 71 S.Ct. 303

(1951); *Chaplinsky v. New Hampshire,* 315 U.S. 568, 86 L.Ed. 1031, 62 S.Ct. 766 (1941). *See also Bachellar v. Maryland, supra.*

In *Chaplinsky,* the Supreme Court upheld a New Hampshire statute, which the highest court of that State had construed as outlawing in public places words likely to provoke the average person to retaliation and thus cause a breach of the peace. Speaking for a unaminous Court, Mr. Justice Murphy said, "There are certain well defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any constitutional problem. These include . . . the insulting or 'fighting' words . . . those by which their very utterance . . . tend to incite an immediate breach of the peace. It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." *Chaplinsky v. New Hampshire, supra* at 571-572, 86 L.Ed. at 1035, 62 S.Ct. at 769.

**[5]** We hold that Section (a)(2), as construed by Judge Martin, was constitutional. It neither prohibited nor "chilled" the exercise of any right protected by the First Amendment, and we have no apprehension that any citizen of good will who respected and desired to obey the law would have had any difficulty understanding it.

Irrespective of the constitutionality of Section (a)(2) defendant contends that the State's evidence failed to establish a violation of the section as interpreted by Judge Martin, and that he erred in denying defendant's motion to nonsuit the charge of disorderly conduct. We hold, however, that the evidence, considered in the light most favorable to the State, was sufficient to support the verdict.

**[6]** A hospital emergency room, the place to which members of the public are taken or betake themselves when injured or stricken by sudden illness, is undoubtedly a public place. *State v. Fenner,* 263 N.C. 694, 698, 140 S.E. 2d 349, 352 (1965); *People v. Kemick,* 17 Cal. App. 3rd 419, 94 Cal. Rptr. 835 (1971). In an emergency room the most circumspect conduct is required for there, order, peace and quiet must prevail if its purpose is fulfilled. Turbulence must not be permitted. It requires no stretch of the imagination to envision the potential and inherent danger to the seriously injured and critically ill

from apprehension and shock created by boisterous cursing and swearing and threatening utterances, be they specifically or generally directed. *See People v. Ennis,* 45 N.Y.S. 2d 446 (1943).

[7] "First Amendment rights must always be applied 'in light of the special characteristics of the environment' in the particular case." *Healy v. James,* 408 U.S. 169, 180, 33 L.Ed. 2d 266, 279, 92 S.Ct. 2338, 2345 (1971). A hospital emergency room is not an appropriate forum for political discussion or the general dissemination of ideas. Nor was defendant attempting to use it as such. With an .18% concentration of alcohol in his blood stream, defendant was well under the influence of an intoxicant. 7 Cantor, *Traumatic Medicine and Surgery for the Attorney* 514 (1962); American Medical Association Manual, Chemical Tests for Intoxicants, 58-59 (1959). *See State v. Moore,* 245 N.C. 158, 161, 95 S.E. 2d 548, 551 (1956). In common parlance, he was "drunk and disorderly." He had wilfully refused medical attention from the physician, who had the emergency room duty that day and had come to treat him, solely because he was a white man. When informed that the black doctor, whom he had demanded, was not immediately available he began shouting profanities, cursing all whites, and loudly voicing unfounded complaints. Such words and mode of communication in a hospital emergency room are not protected by the First Amendment. They constituted a substantial interference with the orderly operation of the emergency room. Nurse Shaw was disturbed; patients who were waiting for medical attention were agitated.

As a practical matter, of course, neither Nurse Shaw nor any patient—no matter how much aroused or angered they may have been by defendant's conduct—would have had the temerity to fight defendant. Despite his vociferous complaints of pain in the back, the intoxicated 21-year-old male defendant, in the words of one witness, appeared to have "abnormal strength." This appearance was verified by defendant's resistance when Officer Phillips attempted to arrest him. Nurse Shaw and the patients awaiting medical treatment were not "average persons" within the sense that phrase was used in the warrant and by Judge Martin in his interpretation of Section (a)(2). However, the evidence warranted a finding that defendant's dominant purpose was to disrupt the emergency room and that the content and manner of his utterances were

likely to provoke the average, person to retaliation and thus cause an immediate breach of the peace.

Nor was Phillips, to whom much of defendant's invective was directed "the average person"; he was a peace officer charged with the duty of preventing a breach of the peace. However, he reasonably interpreted defendant's utterances as "fighting words"; and he recognized his duty to prevent a breach of the peace and attempted to do so—albeit unsuccessfully.

It is regrettable that we do not have a narrowly drawn statute specifically aimed at preserving order and tranquility in hospitals and outlawing disruptive conduct which interferes with patients' welfare and treatment. *See Colten v. Kentucky, supra,* and *Grayned v. Rockford, supra.* However, we hold that defendant's conduct as shown by the State's evidence, was encompassed by Section (a)(2) as interpreted by Judge Martin.

[8] We also hold that the evidence warranted the jury's finding that Phillips had reasonable grounds to believe that defendant had committed in his presence the misdemeanor with which he was charged. Under these circumstances, irrespective of whether defendant had actually committed the crime, G.S. 15-41(1) (1965) empowered the officer to arrest defendant without a warrant. *State v. Fenner, supra.* Thus, defendant could not legally resist the arrest, and his resistance constituted a violation of G.S. 14-223 as charged in warrant No. 812. It is noted that defendant did not, by motion for nonsuit, challenge the sufficiency of the evidence to sustain this charge. He did except to the court's instructions to the jury "on the resisting arrest charge." In these instructions, however, we find no error.

In his instructions on the charge of disorderly conduct, Judge Martin directed the jury to return a verdict of guilty as charged in warrant No. 813 if satisfied beyond a reasonable doubt that defendant caused a public disturbance at the Pitt Memorial Hospital (1) by wilfully engaging in fighting or (2) by wilfully making offensively course utterances or using abusive language in such a manner as to so arouse the average person as to create a breach of the peace. Aside from the question whether this instruction adequately applied the law to the evidence as required by G.S. 1-180 (1969), it contains **error.**

[9]   All the evidence tended to show that prior to his arrest for disorderly conduct defendant had not engaged in any actual fighting. That came *after* his arrest for disorderly conduct and was the result of the officer's attempt to hold him in custody on the charge. Fighting the officer constituted the offenses for which defendant was charged in warrants Nos. 811 and 812. It was not an element of the disorderly conduct for which he had already been arrested. Since it cannot be determined upon what ground or grounds defendant was convicted of disorderly conduct, the challenged instruction was error. However, under the circumstances of this case, the error was harmless. The six months imposed for disorderly conduct was made to run concurrently with an identical sentence imposed for the offense of "resisting arrest." Defendant's conviction and sentence upon warrant No. 812 is without error and must stand. Thus, the sentence for disorderly conduct imposes no additional burden upon him. "To permit the verdict in [No. 812] to stand would give the defendant his freedom when the valid sentence is served. To grant him a new trial would permit a further prosecution. The error, therefore, insofar as the appellant is concerned is harmless." *State v. Cephus,* 241 N.C. 562, 565, 86 S.E. 2d 70, 72 (1955). *See also* 5 Strong, North Carolina Index 2d *Criminal Law* § 172 (1967).

We discuss next the question raised by defendant's first assignment of error: Whether the two warrants, No. 812, which charged him with resisting an officer and No. 811, which charged him with assaulting an officer, referred to the same conduct. Each warrant specifies that at the time of the alleged offense "such officer [Phillips] was discharging a duty of his office (or his duty) to wit: attempting to hold defendant in custody after arresting him."

At the beginning of the trial, defendant moved that the State be required to elect between the two charges or, in the alternative, that the warrants be quashed "upon the basis of duplicity." (Obviously, the basis for the alternative motion was *duplication* of charges and not *duplicity.* An indictment or warrant is duplicitous when it charges two different and distinct offenses in one count. *State v. Burnett,* 142 N.C. 577, 55 S.E. 72 (1906); *State v. Wilson,* 121 N.C. 650, 28 S.E. 416 (1897); *State v. Cooper,* 101 N.C. 684, 8 S.E. 134 (1884)..

**[10]** The judge was not required to make the State elect between the charges contained in warrants Nos. 811 and 812, *at the beginning of the trial, and before any evidence had been introduced.* "He could not then intelligently have restricted it because he did not know what the evidence would be." *State v. Smith,* 201 N.C. 494, 495, 160 S.E. 577, 578 (1931); *see also State v. Stephens,* 170 N.C. 745, 87 S.E. 131 (1915). However, at the conclusion of the evidence, it had become quite clear that no line of demarcation between defendant's resistance of arrest and his assaults upon the officer could be drawn. The assaults were "the means by which the officer was resisted." *State v. Midyette,* 270 N.C. 229, 234, 154 S.E. 2d 66, 70 (1967). Although the officer formally arrested defendant for disorderly conduct he was never able to hold him in custody. *See* 5 Am. Jur. 2d *Arrest* § 1 (1962). His resistance began at the emergency room and ended with the unfortunate occurrences in the parking lot.

The warrants themselves indicate duplicate charges. Each warrant included all the elements of the offense charged in the other, and each specified only acts of violence which defendant directed at the officer's person while he was attempting to hold defendant in custody. It is noted that the warrant charging defendant with resisting, delaying, and obstructing Phillips in the discharge of his official duties did not also specify as a violation of G.S. 14-223 defendant's interference with Phillips' examination of Wooten, a necessary part of his investigation of the motor vehicle accident. *See State v. Leigh,* 278 N.C. 243, 179 S.E. 2d 708 (1971). At the close of the evidence, defendant's motion that the State be required to elect should have been allowed.

**[11, 12]** Defendant has been twice convicted and sentenced for the same criminal offense. The constitutional guaranty against double jeopardy protects a defendant from multiple punishments for the same offense, a principle recognized in *State v. Parker,* 262 N.C. 679, 138 S.E. 2d 496 (1964). *See also U. S. v. Benz,* 282 U.S. 304, 309, 75 L.Ed. 354, 357, 51 S.Ct. 113, 114 (1931). The fact that concurrent, identical sentences were imposed in each case makes this duplication of conviction and punishment no less a violation of defendant's constitutional right not to be put in jeopardy twice for the same offense. In this situation, the rule enunciated in *State v. Thomas,* 244 N.C. 212, 93 S.E. 2d 63 (1956), and *State v. Riddler,* 244 N.C. 78, 92 S.E. 2d 435 (1956), that where concurrent sentences are

imposed upon conviction on two counts, any error relating to one count only is deemed harmless, can have no application. Accordingly, the warrant charging defendant with assault on an officer while in the discharge of his duty is quashed, the verdict set aside, and the judgment rendered thereon arrested. *State v. Hatcher*, 277 N.C. 380, 177 S.E. 2d 892 (1970) ; *State v. Midyette, supra; State v. Parker, supra.*

As for defendant's motion that he be allowed to examine all statements which the State took from any person during the course of its investigation of the charges against him, "because the State may have some exculpatory statement," see *State v. Davis*, 282 N.C. 107, 191 S.E. 2d 664, decided earlier this term.

Other questions presented by defendant's appeal require no discussion. Except as modified herein, the decision of the Court of Appeals is affirmed.

The result is this:

In defendant's conviction under warrant No. 812 (resisting an officer), we find *no error.*

In defendant's conviction under warrant No. 813 (disorderly conduct), we find *no prejudicial error.*

Defendant's conviction under warrant No. 811 (assaulting a public officer) is vacated and the *judgment arrested.*

Affirmed in part; Reversed in part.