NO. COA13-377

NORTH CAROLINA COURT OF APPEALS

Filed: 7 January 2014

STATE OF NORTH CAROLINA

    v.

JAMES ALLEN MINYARD

Burke County
Nos. 09 CRS 3910
       09 CRS 4222-23
       11 CRS 1471

Appeal by defendant from judgment entered 16 August 2013 by Judge Jerry Cash Martin in Burke County Superior Court. Heard in the Court of Appeals 10 October 2013.

> *Attorney General Roy Cooper, by Assistant Attorney Sherri Horner Lawrence, for the State.*
>
> *Appellate Defender Staples Hughes, by Assistant Appellate Defender Daniel Shatz, for defendant-appellant.*

HUNTER, JR., Robert N., Judge.

James Allen Minyard ("Defendant") appeals from a 16 August 2013 judgment entered after a jury convicted him of (i) attempted first degree sexual offense; (ii) five counts of taking indecent liberties with a minor; and (iii) attaining habitual felon status. Defendant argues the trial court erred by (i) denying Defendant's motion to dismiss the charge of attempted first degree sexual offense; (ii) denying Defendant's motion to dismiss the five counts

of taking indecent liberties with a minor; and (iii) by not conducting a *sua sponte* inquiry into Defendant's capacity to proceed. Defendant also asks this Court to review documents inspected *in camera* by the trial court to determine whether Defendant received all exculpatory materials contained therein. After careful review, we hold the trial court did not err.

## I. Facts & Procedural History

A Burke County grand jury indicted Defendant on 14 September 2009 for first degree sexual offense and six counts of taking indecent liberties with a minor, D.B. ("Theodore").[1] Defendant was also indicted as a habitual felon on 13 June 2011. The cases proceeded to a jury trial on 13 August 2012 in Burke County Superior Court. At the close of the State's evidence, the trial court dismissed one count of taking indecent liberties with a minor and the charge of first degree sexual offense and allowed the charge of attempted first degree sexual offense and the five counts of taking indecent liberties with a minor to proceed to trial. The jury found Defendant guilty of attempted first degree sexual offense, five counts of taking indecent liberties with a minor, and of attaining habitual felon status. The trial court issued

---

[1] Pseudonyms are used to conceal the identities of the juveniles involved in this case.

concurrent sentences of 225-279 months imprisonment for attempted sexual offense and 121-155 months for the five counts of taking indecent liberties with a minor. The five sentences were consolidated into a single Class C judgment. Defendant entered written notice of appeal on 21 August 2012. The testimony presented at trial tended to show the following facts.

In February 2008, Defendant began dating Theodore's mother ("Pamela") after meeting on an Internet dating website. Pamela testified that her relationship with Defendant began well: the two spent time together, took trips together, and "had a good time." Pamela has three children: a son who was seven years old at the time of trial ("Phillip"), a daughter who was eleven years old at the time of trial ("Paulina"), and Theodore, who was thirteen years old at the time of trial. Pamela testified that Theodore has an IQ of 64, which "meant that he was mildly mentally retarded." Pamela testified that Defendant also had children at the time she met Defendant, including a six-year-old son ("Daniel") and an infant daughter ("Diana") he saw every other weekend.

Defendant and Pamela's relationship was not physically intimate. Pamela testified that "[a]fter several months I would question him a lot about why he never hugged me, why he never kissed me. We never had any intimacy at all." When asked about

the lack of intimacy, Pamela stated that Defendant told her "that he had been hurt in the past and that he had already ruined lives by having children and he didn't want to ruin any more."

During their relationship, Pamela testified that Defendant "seemed to love my boys. He would always ask for the boys to come over and spend the night with [Daniel] and two other little boys that he kept a lot." Pamela testified that Theodore and Phillip spent the evening at Defendant's house "often," and at least one night a month while Pamela attended her scrapbooking club. Pamela spent evenings at Defendant's home "on the weekends he would get his daughter . . . because he said he didn't want to be alone with [Diana] because he never wanted something said . . . about him being alone with his daughter." Pamela testified that during her visits with Defendant, she would "sleep on the couch and [one of the little boys he kept] would sleep in his room with him, or if I slept in his bed then he would put pillows between us from my head to my feet." Defendant and Pamela's relationship lasted eighteen months and ended in July 2009, with Pamela telling Defendant "to make up his mind about me. If he couldn't be intimate and go further in the relationship, then I – that isn't what I wanted."

In March 2008, Pamela was hospitalized for gastric bypass surgery and gave Defendant power of attorney over her children. Pamela's mother ("Grandmother") stayed with Pamela during her surgery, eventually leaving to see her grandchildren at Defendant's home. Grandmother said Defendant "wouldn't let [her] have [Pamela's] children . . . and he said he was going to call the Law on me." When a member of the sheriff's department arrived at Defendant's house, Grandmother testified that she spoke with the sheriff and left after finding out about the power of attorney. Grandmother testified that she liked Defendant at the start of the relationship with Pamela: "I thought that, you know, because they'd get out and go to those races and, you know, to Pizza Hut and have birthday parties with the kids. And I thought he was all right then."

Pamela testified that Theodore asked to stop going to Defendant's house in December 2008. Pamela said Theodore did not tell her why he wished to stop visiting Defendant at that time. In March 2009, Pamela said Theodore told her Defendant touched him. Pamela asked Defendant about touching Theodore, and Pamela testified that Defendant said he only touched Theodore when he helped bathe him. Theodore was present and Pamela testified that Theodore didn't disagree with Defendant's statement. Pamela also

said Theodore was nine at the time and did not need her help bathing at that age. Pamela testified that around that time Theodore "started having nightmares and would wake up saying he was scared" and "would go to the bathroom and say that he was bleeding and that he was hurting." Pamela also testified she saw Theodore's bloody stools "two or three times."

In August 2009, Grandmother was watching Theodore during his summer vacation from school. Theodore began experiencing pain going to the bathroom:

> A. He was at my home. He was staying the week with me, so -- before he went back to school. And he had went to the bathroom and he come in there and said that he was hurting. And I asked him what was wrong. And he said that [Defendant] had hurt him in his behind and --
>
> Q. Did he -- did he say anything more particular than that or was that exactly what he said?
>
> A. He just said he entered -- I can't remember the exact words -- but he entered his bottom, his behind.
>
> Q. All right. Did he say anything about touching his private part?
>
> A. Yeah.
>
> Q. What did he say about that?
>
> A. He said he played with his, his front ends (phonetic).
>
> Q. Okay. And when he told you that what was

his demeanor like?

A. He was just crying, upset.

Grandmother called Pamela and asked if Theodore recounted these events to her, and Pamela said he had not. Grandmother called the Burke County Department of Social Services ("DSS"). Grandmother also said she was unaware that Defendant and Pamela were no longer dating at that time. Pamela asked Theodore about Grandmother's statements after Grandmother's phone call:

> Q. Okay. Did you ever talk to [Theodore] after that?
>
> A. I did.
>
> Q. About [Defendant] touching him?
>
> A. I did.
>
> Q. What did he tell you?
>
> A. He said that [Defendant] would spit in his hand and pull on his weenie, and that he would make him lay on his side and he would stick his weenie up his butt.
>
> Q. Okay. And what did you do once you heard that?
>
> A. I sent [Defendant] a really bad e-mail.
>
> Q. Okay. And did [Theodore] tell you about how many times that happened?
>
> A. He said five or six times.

Pamela contacted Defendant on 12 August 2009 and asked him to leave her alone. Pamela also stated that Defendant said "he did not want me to take [Phillip] out of his life and that I didn't deserve to have him." Pamela said Defendant began requesting reimbursement for repairs Defendant made to the heat pump on her home and that Defendant filed a lawsuit against Pamela seeking $1,279 in reimbursement for his work on the heat pump.

Pamela spoke with DSS on 18 August 2009, and thereafter took Theodore to the Burke County Child Advocacy Center, known as the Gingerbread House ("Gingerbread House"). Shelley Winters ("Ms. Winters"), a forensic interviewer at the Gingerbread House, interviewed Theodore on 19 August 2009. Ms. Winter's interview with Theodore was entered into evidence and played for the jury. Elizabeth Browning ("Ms. Browning"), a sexual assault nurse examiner, examined Theodore on 21 August 2009. Ms. Browning performed a medical exam where she asked Theodore if he had "any concerns about his body." Ms. Browning said:

> He told me that [Defendant] had put his private in his butt and had touched his wee-wee. He told me that he had spit on his finger and touched his . . . his weenie[.] . . . And he said that when he put it in his butt that it hurt. He said that it was big and hairy. He told me not to tell my mama but I did.

Ms. Browning also observed that Theodore had a healed anal fissure. Ms. Browning noted that this was not abnormal and that a number of causes, such as large bowel movements, could create an anal fissure. Ms. Browning also said Theodore stated that the Defendant would be "mean and whooped me . . . in the bedroom in his -- at his house."

Agent Angeline Mary Bumgarner ("Agent Bumgarner") of the Burke County Sheriff's Office worked as a child sex crimes detective and was assigned Theodore's case. Agent Bumgarner reviewed DSS reports concerning Theodore, reviewed video of Theodore's interview with Ms. Winters, reviewed Ms. Browning's medical report, spoke with Pamela, and charged Defendant with six counts of taking indecent liberties with a minor. Defendant was arrested on 21 August 2009. After arrest, Defendant made a statement that Agent Bumgarner read into evidence:

> "I, [Defendant], want to make the following statement: I started dating [Pamela] on February 8, 2008. I was comfortable with her and her kids and they were comfortable with me. Around the first part of March, 2009, [Pamela] contacted me and said [Theodore] told her that I had touched [Theodore], he wouldn't tell how he was touched. I told [Pamela] that I didn't want to be around her or her kids because I was paranoid because I didn't want to lose my own kids. [Pamela] begged me to come back, she would come over but I wouldn't let [Theodore] stay the night unless she was there. Whenever [Pamela's] kids stayed the

> night, each one had their own areas to sleep; there was a bunk bed, [Diana's] bedroom or the couch. Every now and then [Phillip], would sneek (sic) in my room and sleep and I would tell [Pamela] everytime (sic) that happened. I just had [Pamela] served for work that I did for her and money I used from my company to do the work."

Theodore testified at trial, saying that Defendant touched "[m]y butt and my wiener." When asked what part of Defendant's body touched him, Theodore said "[h]is wiener. His wiener." Theodore stated that Defendant's "wiener" touched his "butt" four or five times in Defendant's bedroom. Theodore testified that Defendant used to spank him with a leather belt and told Theodore not tell anyone about the spanking. When the State's counsel asked "how did his weenie touch your bottom?," Theodore answered that he did not remember how it happened. Theodore said Defendant's "weenie" touching his bottom made him sad. Theodore stated that he told Grandmother about Defendant touching him while he was in the bathtub. Theodore also testified that he spoke to Pamela, Grandmother, and to someone at the Gingerbread House about Defendant touching him.

Defendant moved to dismiss all charges at the close of the State's evidence. The trial court allowed the motion to dismiss the charges of first degree sexual offense and one charge of indecent liberties with a child, but allowed the charges of

attempted first degree sexual offense and the remaining five charges of indecent liberties with a minor to proceed.

Defendant recounted positive experiences at the start of his relationship with Pamela, such as taking Pamela's children on road trips to Tweetsie Railroad, Grandfather Mountain, and the Blue Ridge Parkway. Defendant testified that he had diabetes, a prior gastric bypass surgery, and erectile dysfunction that affected his relationship with Pamela "horribly." Defendant testified that he took several types of medication to treat his erectile dysfunction and that "none of it worked." Defendant doubled his dosage "in hopes that, you know, I could give her the one thing that she wanted most in me." Defendant said his erectile dysfunction contributed to his breakup with Pamela. Regarding Theodore's pain using the restroom, Defendant testified that Theodore experienced pain using the restroom, suffered from constipation, and experienced large resulting bowel movements. Defendant testified that he had to remove and repair toilets occasionally after Theodore used the restroom, and that he did not believe Theodore received medication to treat the issue. Defendant also said that Grandmother did not like him from "day one."

Defendant testified about a two-week vacation to Dollywood in Pigeon Forge, Tennessee beginning 1 July 2009. Defendant, Pamela,

Theodore, Phillip, Paulina, Daniel, Defendant's brother, and Defendant's brother's girlfriend and her children went on the trip. During the trip, Defendant planned to "stop by the chapel there in Pigeon Forge" and marry Pamela. However, Defendant testified that "the closer the time got to us being in that position, something just scared the socks off me and just said, you know, 'Don't do it.'" Defendant and Pamela's relationship ended shortly after in July 2009. Defendant renewed his motion to dismiss at the close of his case.

After the jury began deliberations, Defendant's counsel notified the court that Defendant was "having a little problem." Defendant was asked to "stay vertical" and the trial court told him:

> [Defendant], you've been able to join us all the way through this. And let me suggest to you that you continue to do that. If you go out on us, I very likely will revoke your conditions of release. I'll order you arrested. We'll call emergency medical services; we'll let them examine you. If you're healthy, you'll be here laid out on a stretcher if need be. If you're not healthy, we will continue on without you, whether you're here or not. So do your very best to stay vertical, stay conscious, stay with us.

Before the jury returned, the trial court received a report that Defendant had "overdosed." One of Defendant's witnesses, Evelyn Gantt, told the court that Defendant consumed eight Xanax pills

because "[h]e was just worried about the outcome and I don't know why he took the pills." Defendant's counsel and the State did not wish to be heard on the issue and Defendant's pretrial release was revoked. The sheriff was directed to have Defendant examined by emergency medical services ("EMS"), and Defendant was then escorted from the courtroom. The court then made findings of fact:

> The Court finds Defendant left the courtroom without his lawyer.
>
> The Court finds that while the jury was in deliberation -- the jury had a question concerning an issue in the case -- and prior to the jurors being returned to the courtroom for a determination of the question, the Court directed the Defendant to -- who was in the courtroom at that point -- to return to the Defendant's table with his counsel. Defendant refused, but remained in the courtroom. The Court permitted that.
>
> The Court noticed that after the question was resolved with the juror, that while the jury was out in deliberations working on Defendant's case, the Defendant took an overdose of Xanax. While he was here in the courtroom and while the jury was still out in deliberations, Defendant became lethargic and slumped over in the courtroom.
>
> . . . .
>
> The Court finds that outside of the jury's presence the Court noted that Defendant was stuporous and refused to cooperate with the Court and refused reasonable requests by bailiffs.
>
> . . . .

The Court finds that Defendant's conduct on the occasion disrupted the proceedings of the Court and took substantial amount of time to resolve how the Court should proceed. The Court finally ordered that Defendant's conditions of pretrial release be revoked and ordered the Defendant into the custody of the sheriff, requesting the sheriff to get a medical evaluation of the Defendant.

The Court finds that Defendant, by his own conduct, voluntarily disrupted the proceedings in this matter by stopping the proceedings for a period of time so the Court might resolve the issue of his overdose.

The Court notes that the -- with the consent of the State and Defendant's counsel that the jurors continued in deliberation and continued to review matters that were requested by them by way of question.

The Court infers from Defendant's conduct on the occasion that it was an attempt by him to garner sympathy from the jurors. However, the Court notes that all of Defendant's conduct that was observable was outside of the jury's presence.

The Court notes that both State and Defendant prefer that the Court not instruct jurors about Defendant's absence. And the Court made no reference to Defendant being absent when jurors came in with response to -- or in response to question or questions that had been asked.

After the jury entered its verdict, the trial court amended its statement after EMS indicated that Defendant consumed "fifteen Klonopin" and two 40-ounce alcoholic beverages, which the court

inferred were from the "two beer cans . . . found in the back of his truck." Defendant was tried and sentenced as a habitual felon on 16 August 2012. Defendant made a motion to dismiss at the close of evidence in his habitual felon proceeding, which was denied. Defendant timely filed his notice of appeal on 21 August 2012.

## II. Jurisdiction & Standard of Review

Defendant appeals as of right from a decision of the trial court. N.C. Gen. Stat. §§ 7A-27(b), 15A-1444(a) (2011).

Defendant raises three issues on appeal. The first issue concerns whether sufficient evidence exists showing Defendant attempted to penetrate Theodore's anus with his penis in violation of N.C. Gen. Stat. § 14-27.4(a)(1) (2011). Defendant argues that insufficient evidence existed and that his motion to dismiss was thus improperly denied. The second issue on appeal is whether sufficient evidence exists to show Defendant committed five counts of indecent liberties with a minor in violation of N.C. Gen. Stat. § 14-202.1(a)(1) (2011). Defendant again argues his motion to dismiss these counts was improperly denied. The first two issues are issues of law, and reviewed *de novo*. *State v. Bagley*, 183 N.C. App. 514, 523, 644 S.E.2d 615, 621 (2007). Further:

> A motion to dismiss should be denied if there
> is substantial evidence of each essential
> element of the charged offense and substantial
> evidence that the defendant is the individual

who committed it. Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. The court must consider the evidence in the light most favorable to the State. Furthermore, the State is entitled to every reasonable inference to be drawn from the evidence.

Circumstantial evidence may withstand a motion to dismiss and support a conviction even when the evidence does not rule out every hypothesis of innocence. The evidence need only give rise to a reasonable inference of guilt in order for it to be properly submitted to the jury for a determination of defendant's guilt beyond a reasonable doubt.

*State v. Foreman*, 133 N.C. App. 292, 298, 515 S.E.2d 488, 493 (1999) *aff'd as modified*, 351 N.C. 627, 527 S.E.2d 921 (2000) (internal citations and quotation marks omitted). "Any contradictions or discrepancies in the evidence are for the jury to resolve and do not warrant dismissal." *State v. Rasor*, 319 N.C. 577, 585, 356 S.E.2d 328, 334 (1987).

The third issue on appeal is whether the court improperly failed to institute, *sua sponte*, a competency hearing during the trial when Defendant became "stuporous and non-responsive" during the trial. This issue is a question of law, and is reviewed *de novo*. "Conclusions of law are reviewed de novo and are subject to full review." *State v. Biber*, 365 N.C. 162, 168, 712 S.E.2d 874, 878 (2011); *see also Carolina Power & Light Co. v. City of*

*Asheville*, 358 N.C. 512, 517, 597 S.E.2d 717, 721 (2004) ("Conclusions of law drawn by the trial court from its findings of fact are reviewable *de novo* on appeal.").

Lastly, Defendant asks this Court to review sealed documents provided to the trial court for *in camera* review of Theodore's medical and other records to determine if Defendant received all exculpatory evidence. In *Pennsylvania v. Ritchie*, 480 U.S. 39 (1987), the United States Supreme Court held that a defendant accused of sexual abuse of a child may "have confidential records of a child abuse agency turned over to the trial court for *in camera* review and release of material information." *State v. Kelly*, 118 N.C. App. 589, 592, 456 S.E.2d 861, 865 (1995) (citing *Ritchie*, 480 U.S. at 39). If the trial court conducts an *in camera* inspection but denies the defendant's request for the evidence, the evidence should be sealed and "placed in the record for appellate review." *State v. McGill*, 141 N.C. App. 98, 101, 539 S.E.2d 351, 355 (2000) (quoting *State v. Hardy*, 293 N.C. 105, 128, 235 S.E.2d 828, 842 (1977)). Further:

> On appeal, this Court is required to examine the sealed records to determine if they contain information that is both favorable to the accused and material to [either his] guilt or punishment. If the sealed records contain evidence which is both "favorable" and "material," defendant is constitutionally entitled to disclosure of this evidence.

*Id.* at 101-02, 539 S.E.2d at 355 (quotation and citation omitted). We review the trial court's determination of whether a sealed record contains exculpatory evidence *de novo*. *State v. McCoy*, ___ N.C. App. ___, ___, 745 S.E.2d 367, 370 (2013).

### III. Analysis

### i. Attempted First Degree Sexual Offense

Defendant argues the trial court erred by denying his motion to dismiss and allowing the State to present evidence to the jury concerning his first charge, attempted first degree sexual offense. We disagree.

N.C. Gen. Stat. § 14-27.4 (2011) provides:

> (a) A person is guilty of a sexual offense in the first degree if the person engages in a sexual act:
>
> (1) With a victim who is a child under the age of 13 years and the defendant is at least 12 years old and is at least four years older than the victim.

A sexual act is defined as "cunnilingus, fellatio, analingus, or anal intercourse, but does not include vaginal intercourse. Sexual act also means the penetration, however slight, by any object into the genital or anal opening of another person's body: provided, that it shall be an affirmative defense that the penetration was for accepted medical purposes." N.C. Gen. Stat. § 14-27.1(4)

(2011). "The elements of an attempt to commit any crime are: (1) the intent to commit the substantive offense, and (2) an overt act done for that purpose which goes beyond mere preparation, but (3) falls short of the completed offense." *State v. Miller*, 344 N.C. 658, 667, 477 S.E.2d 915, 921 (1996). The State need not present evidence of an actual attempted penetration, but the evidence presented must be sufficient to show the defendant intended to engage in the completed offense. *State v. Dunston*, 90 N.C. App. 622, 624–25, 369 S.E.2d 636, 638 (1988).

Here, the age requirements are satisfied: Defendant was forty-five years old and Theodore was nine years old in March 2009, when Theodore first spoke of Defendant touching him in the bathtub. We next turn to whether there is a scintilla of evidence showing Defendant's intent. In *State v. Buff*, 170 N.C. App. 374, 612 S.E.2d 366 (2005), the defendant argued the State did not put forward sufficient evidence for an attempted second degree sexual offense. *Id.* at 380, 612 S.E.2d at 371. This Court held substantial evidence existed and affirmed the trial court's denial of the motion to dismiss:

> Waters testified that he observed defendant "[go] down her pants" while fondling L.W.'s breast. He then observed defendant remove L.W.'s pants and touch her "private," which was clarified to mean between her legs, but did not observe him insert anything inside her

private. As noted previously, L.W. testified that she never consented to any type of sexual conduct with defendant, and sufficient evidence as to L.W.'s physical helplessness was offered. Therefore, when taken in the light most favorable to the State, the evidence presented *showed defendant committed several overt acts, including touching L.W.'s breast and vaginal area, demonstrating intent to commit a sexual act* against L.W.'s will and without her consent. The evidence, therefore, was sufficient to reach the jury as to the charge of attempted second degree sexual offense.

*Id.* at 380–81, 612 S.E.2d at 371 (emphasis added).

Here, only Theodore's testimony could be considered when the trial court denied the motion to dismiss. *State v. Ludlum*, 303 N.C. 666, 669, 281 S.E.2d 159, 161 (1981) (noting that corroborative testimony cannot be considered "substantive evidence of the facts stated"). The trial court recognized this and re-stated only Theodore's testimony before denying Defendant's motion to dismiss on attempted first degree sexual offense. Theodore's testimony, taken in the light most favorable to the State, shows Defendant "committed several overt acts . . . demonstrating intent to commit a sexual act." *Buff*, 170 N.C. App. at 380, 612 S.E.2d at 371. The act of placing one's penis on a child's buttocks provides substantive evidence of intent to commit a first degree sexual offense, specifically anal intercourse. *See* N.C. Gen.

Stat. § 14-27.1(4); *Buff*, 170 N.C. App. at 380-81, 612 S.E.2d at 371.

Defendant points to testimony showing intent in *State v. Mueller*, 184 N.C. App. 553, 647 S.E.2d 440 (2007). In *Mueller*, the defendant took his victim to secluded areas and would "place his penis between her thighs and move back and forth until he ejaculated on her." *Id.* at 563-64, 647 S.E.2d at 448-49. The defendant in *Mueller* repeated this act over several years and also told the victim "he loved her and wanted to have sex with her." *Id.* This Court held the defendant's actions were sufficient for the trial court to find the evidence of intent required for attempt. *Id.* Defendant argues *Mueller* "sharply" contrasts with the present case; however, the distinction is inappropriate. While the acts in *Mueller* and statements by the defendant clearly show the intent necessary for attempt, so too did the State's evidence in *Buff* where "defendant committed several overt acts, including touching L.W.'s breast and vaginal area, demonstrating intent to commit a sexual act." *Buff*, 170 N.C. App. at 380, 612 S.E.2d at 371. Similarly here, while Theodore did not testify that Defendant stated a desire to engage in anal intercourse with him, Defendant's acts themselves provide evidence of the required intent. Intent may be present in the absence of a fully completed act. *See State*

*v. Sines*, 158 N.C. App. 79, 85, 579 S.E.2d 895, 899, *cert. denied*, 357 N.C. 468, 587 S.E.2d 69 (2003) (holding the requisite intent existed in an attempted statutory sexual offense where the sexual act did not occur). Thus the first element is satisfied.

The next required element is an overt act. Overt acts are sometimes coupled with demands for sexual acts. For example, in *State v. Henderson*, 182 N.C. App. 406, 642 S.E.2d 509 (2007), "[t]he evidence in the instant case tended to show that defendant removed his pants, walked into the room where his seven-or eight-year-old daughter was seated, stood in front of her, and asked her to put his penis in her mouth." *Id.* at 412–13, 642 S.E.2d at 513–14. This was held to be an overt act satisfying the second element of attempt. *Id.; see also Sines*, 158 N.C. App. at 85, 579 S.E.2d at 899 ("Defendant's placement of his penis in front of victim's face, coupled with his demand for oral sex, comprise an overt act[.]").

Theodore's testimony does not include statements that Defendant demanded he perform a sexual act. However, the alleged acts themselves are overt acts exceeding mere preparation and statements of intent are not explicitly required. *Buff*, 170 N.C. App. at 380, 612 S.E.2d at 371 ("[T]he evidence presented showed defendant committed several overt acts, including touching L.W.'s

breast and vaginal area, demonstrating intent to commit a sexual act."). Thus, Theodore's testimony that Defendant placed his penis on Theodore's buttocks satisfies the second element of attempt.

Lastly, the third element requires that the attempted crime was not consummated. *Miller*, 344 N.C. at 667, 477 S.E.2d at 921. Here, the trial court noted that only corroborative direct testimony showed Theodore's anus was penetrated by Defendant. However, Theodore's testimony by itself provides evidence of at least a non-consummated "sexual act" and satisfies the evidentiary predicate for the third element of attempt.

Taken in the totality of the circumstances, Theodore's statements provide the circumstantial and substantive evidence such that a jury could believe that Defendant intended to commit a first degree sexual offense against Theodore and that overt acts were taken toward that end. We therefore hold the trial court did not err in denying Defendant's motion to dismiss the charge of attempted first degree sexual offense.

### ii. Indecent Liberties with a Minor

Defendant next argues the State presented insufficient evidence to support five counts of indecent liberties with a minor. Defendant argues that Theodore's statements that Defendant touched his buttocks with his penis "'four or five times' only establishes

suspicion or conjecture that there were five touchings and not four." Defendant further argues Theodore's testimony was insufficient to establish the touchings occurred in separate incidents. We disagree.

N.C. Gen. Stat. § 14-202.1 (2011) provides:

> (a) A person is guilty of taking indecent liberties with children if, being 16 years of age or more and at least five years older than the child in question, he either:
>
> (1) Willfully takes or attempts to take any immoral, improper, or indecent liberties with any child of either sex under the age of 16 years for the purpose of arousing or gratifying sexual desire; or
>
> (2) Willfully commits or attempts to commit any lewd or lascivious act upon or with the body or any part or member of the body of any child of either sex under the age of 16 years.

§ 14-202.1 does not require a completed sex act nor an offensive touching of the victim. "Indecent liberties are defined as such liberties as the common sense of society would regard as indecent and improper. Neither a completed sex act nor an offensive touching of the victim are required to violate the statute." *State v. McClary*, 198 N.C. App. 169, 173, 679 S.E.2d 414, 417–18 (2009) (citations and quotation marks omitted). Further:

> The State is required to show that the action by the defendant was for the purpose of arousing or gratifying sexual desire. A variety of acts may be considered indecent and

> may be performed to provide sexual gratification to the actor. Moreover, the variety of acts included under the statute demonstrate that the scope of the statute's protection is to encompass more types of deviant behavior and provide children with broader protection than that available under statutes proscribing other sexual acts.
>
> . . . .
>
> The requirement that defendant's actions were for the purpose of arousing or gratifying sexual desire may be inferred from the evidence of the defendant's actions.

*Id.* at 173–74, 679 S.E.2d at 418 (quotation and citation omitted). Similar to first degree attempted sexual offense, "the crime of indecent liberties is a single offense which may be proved by evidence of the commission of any one of a number of acts." *State v. Hartness*, 326 N.C. 561, 567, 391 S.E.2d 177, 180 (1990).

Here, Theodore, a mildly mentally retarded juvenile, testified that Defendant touched his "butt" with his penis four or five times. These alleged actions are ones that "the common sense of society would regard as indecent and improper." *McClary*, 198 N.C. App. at 174, 679 S.E.2d at 418 (citation and quotation marks omitted). The statute is designed to protect children against a broader range of sexually deviant behaviors and Defendant's alleged conduct falls within that ambit. *See id.*

A further issue is whether five total counts were justified by Theodore's testimony. Defendant argues that the "State must show that the defendant took indecent liberties with the child in separate incidents, rather than as part of a single transaction or occurrence." To support this assertion, Defendant points to *State v. Laney*, 178 N.C. App. 337, 631 S.E.2d 522 (2006), where we held that a defendant who put his hands on a victim's breasts and inside the waistband of the victim's pants were one continuous act of touching and not separate and distinct sexual acts warranting multiple charges. *Id.* at 341, 631 S.E.2d at 524-25. In *Laney*, evidence showed that both touchings occurred on the same evening, 21 January 2004. *Id.* at 341, 631 S.E.2d at 524. Theodore's testimony shows neither that the alleged acts occurred either on the same evening or on separate occasions. However, this Court in *State v. Williams*, 201 N.C. App. 161, 689 S.E.2d 412 (2009) noted that no such requirement for discrete separate occasions is necessary when the alleged acts are more explicit than mere touchings:

> [I]n *State v. James*, 182 N.C. App. 698, 643 S.E.2d 34 (2007), this Court, in distinguishing *State v. Laney*, stated that as opposed to mere touching, "multiple sexual acts, *even in a single encounter*, may form the basis for multiple indictments for indecent liberties." *James*, 182 N.C. App. at 705, 643 S.E.2d at 38. Thus, this Court found that a

> different analytical path should be applied when dealing with "sexual acts" as opposed to touching in the context of charges of indecent liberties. *Id.*

*Id.* at 185, 689 S.E.2d at 425 (emphasis added); *see also State v. Coleman*, 200 N.C. App. 696, 706, 684 S.E.2d 513, 520 (2009), *rev. denied*, 364 N.C. 129, 696 S.E.2d 527 (2010).

This Court held, in *State v. Garrett*, 201 N.C. App. 159, 688 S.E.2d 118, 2009 WL 3818845 (2009) (unpublished), that a child's corroborated testimony that a "defendant *touched* her private part, which she identified as her vagina" was sufficient to show *penetration* in a rape case. *Id.* at *4 (emphasis added). The defendant in *Garrett* argued that the child's testimony was "ambiguous" and showed only touching occurred, rather than penetration. *Id.* Here, similar facts exist: circumstantial evidence given by Theodore's family and attending physicians provide the scintilla of evidence necessary for the trial court to find that multiple sexual acts were committed against Theodore. Theodore's in court testimony describes an adult male touching a child while the child bathed and touching his buttocks with his penis "four or five times." The accusations levied by Theodore's in-court testimony are more properly categorized as distinct sexual acts similar to *James*, rather than mere "touchings" as in *Laney*, and thus the multiple counts can be proper.

Next, the requirement of "purpose of arousing or gratifying sexual desire" may be "inferred from the evidence of defendant's actions." *See* N.C. Gen. Stat. § 14-202.1; *McClary*, 198 N.C. App. at 174, 679 S.E.2d at 418 (citation and quotation marks omitted). Theodore's statements of Defendant's alleged actions provide ample evidence to infer Defendant's purpose of obtaining sexual gratification. *Cf. State v. Creech*, 128 N.C. App. 592, 599, 495 S.E.2d 752, 756 (1998) (holding defendant's actions in giving massages to young boys while wearing only his underwear and the child wearing only shorts were "for the purpose of arousing or gratifying sexual desire").

For the above reasons, we hold the Defendant's motion to dismiss the five counts of taking indecent liberties with a child was properly denied.

### iii. Defendant's Capacity to Proceed

Defendant argues that the trial court erred by failing to conduct a *sua sponte* competency hearing after he ingested a large quantity of sedative, hypnotic or anxiolytic medications and alcohol. Because Defendant voluntarily ingested these substances in a non-capital trial, he voluntarily waived his constitutional right to be present. Thus, we disagree with Defendant that a *sua*

*sponte* competency hearing was required and hold the trial court committed no error.

"[A] trial court has a constitutional duty to institute, *sua sponte*, a competency hearing *if there is substantial evidence before the court* indicating that the accused may be mentally incompetent." *State v. McRae*, 139 N.C. App. 387, 390, 533 S.E.2d 557, 559 (2000) (quotation marks and citation omitted) (emphasis in original); *see also State v. Whitted*, 209 N.C. App. 522, 527–28, 705 S.E.2d 787, 791–92 (2011) (holding a defendant was denied a fair trial because the trial court did not inquire *sua sponte* into her competency); *State v. Coley*, 193 N.C. App. 458, 461, 668 S.E.2d 46, 49 (2008), *aff'd*, 363 N.C. 622, 683 S.E.2d 208 (2009). N.C. Gen. Stat. § 15A-1001(a) (2011) also requires a competency finding before defendants may stand trial:

> No person may be tried, convicted, sentenced, or punished for a crime when by reason of mental illness or defect he is unable to understand the nature and object of the proceedings against him, to comprehend his own situation in reference to the proceedings, or to assist in his defense in a rational or reasonable manner.

The State, a defendant, a defense counsel, or the trial court may move for a competency determination. N.C. Gen. Stat. § 15A-1002(a) (2011). If raised by any party, the trial court has a statutory

duty to hold a hearing to resolve questions of competency.  N.C. Gen. Stat. § 15A-1002(b).

On review, this Court "must carefully evaluate the facts in each case in determining whether to reverse a trial judge for failure to conduct *sua sponte* a competency hearing where the discretion of the trial judge, as to the conduct of the hearing and as to the ultimate ruling on the issue, is manifest."  *State v. Staten*, 172 N.C. App. 673, 682, 616 S.E.2d 650, 657 (2005). Further:

> Evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant to a *bona fide* doubt inquiry. There are, of course, no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated.

*Id.* at 678–79, 616 S.E.2d at 655 (internal quotation marks and citations omitted).  While the trial court's competency findings receive deference, other "findings and expressions of concern about the temporal nature of [a] defendant's competency" may raise a bona fide doubt as to a defendant's competency.  *McRae*, 139 N.C. App. at 391, 533 S.E.2d at 560; *Whitted*, 209 N.C. App. at 529, 705 S.E.2d at 792 ("[D]efendants can be competent at one point in time and not competent at another.").

The appropriate test for a defendant's competency to stand trial is "whether the defendant has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and has a rational as well as factual understanding of the proceedings against him." *State v. Badgett*, 361 N.C. 234, 259, 644 S.E.2d 206, 221 (2007) (quotation marks and citations omitted). A defendant need not "be at the highest stage of mental alertness to be competent to be tried." *State v. Shytle*, 323 N.C. 684, 689, 374 S.E.2d 573, 575 (1989). "So long as a defendant can confer with his or her attorney so that the attorney may interpose any available defenses for him or her, the defendant is able to assist his or her defense in a rational manner." *Id*.

A trial court may also remove a defendant for disruptive conduct pursuant to N.C. Gen. Stat. § 15A-1032 (2011):

> (a) A trial judge, after warning a defendant whose conduct is disrupting his trial, may order the defendant removed from the trial if he continues conduct which is so disruptive that the trial cannot proceed in an orderly manner. When practicable, the judge's warning and order for removal must be issued out of the presence of the jury.
>
> (b) If the judge orders a defendant removed from the courtroom, he must:
> (1) Enter in the record the reasons for his action; and
> (2) Instruct the jurors that the removal is not to be considered in weighing evidence or determining the issue of guilt.

> A defendant removed from the courtroom must be given the opportunity of learning of the trial proceedings through his counsel at reasonable intervals as directed by the court and must be given opportunity to return to the courtroom during the trial upon assurance of his good behavior.

Further, a trial court "has inherent power to take whatever legitimate steps are necessary to maintain proper decorum and appropriate atmosphere in the courtroom during a trial" including removing "an unruly defendant." *State v. Brown*, 19 N.C. App. 480, 485, 199 S.E.2d 134, 137, *appeal dismissed*, 284 N.C. 255, 200 S.E.2d 659 (1973).

"[I]n a non-capital trial, the defendant's right to be present is personal and may be waived." *State v. Forrest*, 168 N.C. App. 614, 622, 609 S.E.2d 241, 246 (2005); *see also State v. Wilson*, 31 N.C. App. 323, 327, 229 S.E.2d 314, 317 (1976) (holding the defendant's action of leaving during the jury charge was a voluntary waiver of his right to be present). Additionally, "[a] defendant is not prejudiced by the granting of relief which he has sought or by *error resulting from his own conduct*." N.C. Gen. Stat. § 15A-1443(c) (2011) (emphasis added).

Other state and federal courts have addressed the issue of a defendant voluntarily ingesting intoxicants and destroying competency. *See* Victor G. Haddox, et. al, *Mental Competency to*

*Stand Trial While Under the Influence of Drugs*, 7 Loy. L.A. L. Rev. 425, 442-43 (1974). In *People v. Rogers*, 309 P.2d 949 (Cal. App. 1957), the defendant intentionally injected himself with large doses of insulin to induce insulin shock and to avoid trial. *Id.* at 955-56. The First District Court of Appeal in California held

> there is ample authority for holding that a statute granting a right to an accused in categorical terms may be waived by the voluntary act of the person entitled. That is this case. *The defendant, by his own actions, induced the condition existing in the afternoon of the fourth day of the trial. This amounted to a waiver of the right to be mentally present* granted by section 1043 of the Penal Code. *If this were not the rule, many persons, by their own acts, could effectively prevent themselves from ever being tried*. A diabetic can put himself in insulin shock by simply taking insulin and then not eating, or by refusing to eat, or can disable himself by failing to take insulin. Surely, the Legislature in adopting section 1043 did not intend such an absurd result.

*Id.* at 957 (emphasis added); *see also United States v. Latham*, 874 F.2d 852, 865 (1st Cir. 1989) (Selya, J., concurring) ("When nonattendance results from *controllable* circumstance, waiver should generally follow."); *Hanley v. State*, 434 P.2d 440, 444 (Nev. 1967) ("The defendant's voluntary absence waives his right to be present and he cannot thereafter complain of a situation which he created.").

Here, the case was submitted to the jury for deliberations shortly after a lunch break on 15 August 2012. The trial court instructed Defendant to remain in the courtroom unless he needed to speak with his attorney. Defendant asked whether he could go to the courtroom lobby, which the trial court denied. The trial court temporarily recessed from 2:10 p.m. to 2:38 p.m., pending the jury's verdict. At 2:38 p.m., the jury asked for a transcript of Theodore's forensic interview, and Defendant's attorney alerted the trial court that Defendant was "having a little problem." The trial court said "[s]ir, stay with us if you will. If you go out, we're going to have to go on without you. If you want to see what happens here, try to stay vertical." A bench conference occurred between Judge Martin, the State, and Defendant's counsel, the jury was brought back and told that no such transcript existed, and the jury again departed the courtroom. The trial court then warned Defendant that "[i]f you're not healthy we will continue on without you, whether you're here or not. So do your very best to stay vertical, stay conscious, stay with us."

The jury then asked to review the final ten minutes of the forensic interview DVD. Before the jury returned to the courtroom, Ms. Gantt told the trial court about Defendant's overdose. The trial court then revoked Defendant's bond, had Defendant taken

into custody, and ordered an examination of Defendant by emergency medical services. Defendant's counsel and the State both agreed not to make any remarks about Defendant's absence when the jurors returned to the courtroom. The jury returned to the courtroom and watched the final ten minutes of the forensic interview. Defendant's statements to Agent Bumgarner were also published to the jury. The jury also requested to know when Pamela had her surgery, to which the trial court replied "[i]t is your duty to remember the evidence whether called to your attention or not."

The jury was again dismissed, and the trial court made its findings of fact that Defendant had disrupted the proceedings by leaving the courtroom against the instructions of the court and overdosing on drugs. The trial court found that Defendant was "stuporous and refused to cooperate with the Court and refused reasonable requests by bailiffs," but made these findings out of the jurors' presence. The court stated there was "nothing to indicate" the jurors were aware that Defendant was not present, but noted the requirement that the trial court instruct the jurors that Defendant's absence was "not to be considered in weighing evidence or determining the issue of guilt." Defendant's counsel asked that the instruction be given the following morning so that Defendant could re-join the proceedings.

At 4:31 p.m., Defendant's counsel and the State agreed to allow the jury to return to the courtroom and announce their verdict. The jury delivered their verdict finding Defendant guilty of attempted first degree sexual offense and five counts of taking indecent liberties with a minor. Defendant's counsel was directed to inform Defendant of these events and to request Defendant be present for the habitual felon phase the next morning as well as the sentencing phase of defendant's other charges.

The next morning on 16 August 2012 Defendant was present at the proceedings. The trial court informed Defendant he could choose to testify as to being a habitual felon. Defendant stated he was "hoping to testify yesterday," but that "[u]nfortunate circumstances" did not allow it. The trial court re-stated that the court was considering the habitual felon charge that morning, and Defendant chose not to testify on the habitual felon charge.

The above facts provide ample evidence to raise a bona fide doubt whether Defendant was competent to stand trial. Defendant appeared lethargic, "stuporous," and non-responsive. Such conduct would ordinarily necessitate a *sua sponte* hearing. Evidence of irrational behavior, demeanor at trial, and any prior medical opinion on competence are all relevant to a *bona fide* doubt inquiry. *Staten*, 172 N.C. App. at 678-79, 616 S.E.2d at 655. The

inability to "stay vertical" or to obey the commands of court personnel certainly would give rise to such a *bona fide* doubt. Defendant is also correct that competency may fluctuate during the course of a trial. *See Whitted*, 209 N.C. App. at 528-29, 705 S.E.2d at 792; *Shytle*, 323 N.C. at 688, 374 S.E.2d at 575.

However, Defendant *voluntarily* ingested large quantities of intoxicants in a short period of time apparently with the intent of affecting his competency. This more appropriately invokes an analysis of whether Defendant waived his right to be present during the proceedings. A defendant may waive his/her constitutional right to be present at non-capital trial via his/her own *voluntary actions* that squander those rights:

> [W]here the offense is *not capital* and the accused is not in custody, the prevailing rule has been, that if, after the trial has begun in his presence, he voluntarily absents himself, this does not nullify what has been done or prevent the completion of the trial, but, on the contrary, operates as a waiver of his right to be present, and leaves the court free to proceed with the trial in like manner and with like effect as if he were present.

*Diaz v. United States*, 223 U.S. 442, 455 (1912) (emphasis added); *compare Drope v. Missouri*, 420 U.S. 162, 163-64 (1975) ("We granted certiorari in this case to consider petitioner's claims that he was deprived of due process of law by the failure of the trial court to order a psychiatric examination with respect to his

competence to stand trial and by the conduct *in his absence of a portion of his trial on an indictment charging a capital offense*." (emphasis added)). Voluntary waiver of one's right to be present is a separate inquiry from competency, and in a non-capital case, a defendant may waive the right by their own actions, including actions taken to destroy competency.

The State and Defendant both cite *State v. Harding*, 110 N.C. App. 155, 429 S.E.2d 416 (1993). In *Harding*, this Court held the defendant understood the nature of the proceedings against her and that the defendant's voluntary use of drugs throughout trial did not destroy her mental competency during trial. *Id.* at 166-67, 429 S.E.2d at 423-24. Defendant argues that *Harding* "implies that a greater degree of drug-induced impairment, such as that present in this case, could establish a lack of capacity to proceed." However, in *Harding*, the "defendant was present throughout the proceedings." *Id.* at 166, 429 S.E.2d at 423. The defendant did not "exhibit . . . any signs during trial of being under the influence of any controlled substance." *Id.* Thus, *Harding* never reached the issue of whether a defendant could forfeit his or her right to be present at trial by voluntarily intoxicating himself or herself. *Id.*

Finally, Defendant does not offer evidence that his absence prejudiced the proceedings. Defendant stated an intention to testify but already testified and concluded his case prior to ingesting the intoxicants. Defendant was absent only while the jury was outside the courtroom and deliberating its verdict. Further, any alleged error would have resulted from Defendant's own conduct. *See* N.C. Gen. Stat. § 15A-1443(c).

By voluntarily ingesting intoxicants, Defendant waived his right to be present during a portion of these proceedings. To hold otherwise would create a rule where "many persons, by their own acts, could effectively prevent themselves from ever being tried." *Rogers*, 309 P.2d at 957. Thus we hold the trial court did not err.

### iv. Review of *In Camera* Documents

After careful review of the sealed materials, we conclude the trial court did not violate Defendant's constitutional rights by refusing to disclose Theodore's relevant medical records to Defendant. No exculpatory materials existed within the relevant medical records and the trial court did not err in withholding the records. *See Kelly*, 118 N.C. App. at 592, 456 S.E.2d at 865.

## IV. Conclusion

Based on the foregoing discussion, we hold the trial court did not err in denying Defendant's motions to dismiss, nor in choosing not to conduct a *sua sponte* competency hearing after Defendant voluntarily intoxicated himself and waived his right to be present during a portion of the proceedings.

NO ERROR.

Judges ELMORE and DAVIS concur.